[Civ. No. 2449. Fourth Appellate District.—December 14, 1939.]

CITY OF ELSINORE (a Municipal Corporation), Respondent, v. TEMESCAL WATER COMPANY (a Corporation), Appellant.

Walter S. Clayson, Wood, Crump & Rogers and Guy Richards Crump for Appellant.

Eugene Best, City Attorney, and C. L. McFarland for Respondent.

BARNARD, P, J.—This is an appeal from a judgment construing a contract with reference to the sharing of certain waters flowing in the channel of the San Jacinto River, and enjoining the defendant from diverting, impounding or storing such waters except as provided for in said contract.

The San Jacinto River rises in the San Jacinto mountains and on reaching the valley flows along the base of those mountains in a northwesterly direction for 18 or 20 miles and then makes a ''U'' turn, flowing in a southwesterly direction through Lakeview and Perris Valleys for about 16 miles when it enters and passes through a narrow canyon about four or five miles long and known as Railroad Canyon, and then enters Elsinore Valley and runs into Lake Elsinore. During its course through Railroad Canyon it is joined by the waters of Salt Creek. Between the mouth of Railroad Canyon and Lake Elsinore is a fan-shaped water-bearing detritus or debris cone, which is recharged by the waters of the river on their way to the lake. Water is and has been pumped from wells in this water-bearing cone by various interests and used for irrigation purposes in the Perris Valley. The San Jacinto River is perennial until it reaches the floor of the valley, after which it flows only in the winter season except in wet years

when it flows throughout the year. During that part of its course which lies along the westerly base of the mountains it is fed by many creeks and small streams, and by springs and general run-off from the slope of these mountains.

Lake Elsinore is a natural lake with an area of about seven square miles, a maximum depth of 40 feet, a capacity of 75,000 acre feet and, when full, stands at an elevation of 1261 feet above sea level. Its main source of supply is the flow of the San Jacinto River and it rarely overflows, the last time being in 1916. The City of Elsinore lies on the shore of this lake and depends largely for its prosperity upon housing, feeding and catering to the wants of those who use the lake for various recreational purposes, including boating, bathing and fishing.

The defendant is a mutual water company which supplies water to the city of Corona, and for irrigation purposes near that city. It had a prescriptive right to certain water, and had also pumped water from the lower part of Perris Valley which had been taken in a conduit through Railroad Canyon and on to the vicinity of Corona. In August, 1927, the defendant commenced the construction of a dam near the mouth of Railroad Canyon which would have the effect of cutting off the flow of the San Jacinto River above Lake Elsinore and above the water-bearing cone, the plans including a pipe line and ditch for the purpose of conveying the water past Lake Elsinore. Several suits were brought by the City of Elsinore and other interested parties in the Elsinore Valley, seeking to enjoin the building of this dam. After issue had been joined in these suits a compromise was agreed upon which was expressed in a contract executed on October 29, 1937, between the plaintiffs in the various suits as first parties and this defendant as second party.

This contract, after stating that the first parties are severally the owners of certain parcels of land lying below the mouth of Railroad Canyon, within the watershed of the San Jacinto River, and all or part of which are riparian to either the San Jacinto River or Lake Elsinore or both of them, and that the first parties or some of them are and for many years have been withdrawing water from wells sunk in the debris cone at the mouth of the canyon, recites that it is the desire of the parties to settle and adjust, by this agreement, all

differences between them respecting the issues in the injunction suits which had been filed, the construction of a dam in Railroad Canyon, the maintenance and operation thereof and of the reservoir which would be created thereby, the amount of water which the water company may divert, impound and/or store in the reservoir in addition to the water to which it has a prescriptive right, the amount and extent of such prescriptive right, and the existence at various stages of lake level of waters available for appropriation by the second party and the time and manner of such diversion.

The contract then contains numbered paragraphs setting forth the definite agreements of the parties. The parts thereof which are material here may be summarized or quoted as follows: 1. The water company may construct and operate a dam and reservoir in Railroad Canyon, the dam to be of any height desired but not less than 70 feet above stream bed level. 4. The water company may divert from the river and impound and store in this reservoir "the first waters flowing in Railroad canyon at or above the dam (exclusive of Salt creek waters) up to a maximum in any one year of 2000 acre feet". This 2,000 acre feet is agreed upon and fixed as the amount of water to which the second party is entitled by prescriptive right, which water is thereinafter to be referred to as "prescriptive water". 5. In addition to its prescriptive water the water company may store in the reservoir all or any part of its Perris Valley waters "subject to allocation thereof" as provided in paragraph 6. 6. "All waters, diverted from San Jacinto River and/or Salt Creek, and all other waters impounded and stored in the reservoir, less the amount of the prescriptive water impounded therein and less losses of water stored in the reservoir, shall be allocated in the following ratio: One-sixth to first parties and five-sixth to second party." 8. "Second party may, and it shall have the right (so far as first parties are concerned) to divert into and store in its Railroad Canyon reservoir, from the waters of the San Jacinto River, and Salt Creek, the respective quantities of water hereinafter in this paragraph set forth in addition to its prescriptive water; that is to say": (here follow provisions that an unlimited quantity may be diverted and stored whenever the lake level is above 1255 feet, that certain maximums may be diverted and stored when the lake level is

between 1250 and 1255 feet and when it is between 1245 and 1250 feet, and that the second party "shall not make any diversions from the flow of the San Jacinto River, or Salt Creek, or store any water of the San Jacinto River, or Salt Creek, other than its prescriptive water" whenever the lake level is at or below 1245 feet). "The water company may also impound and store such waters, in addition to the said waters of the San Jacinto River, and Salt Creek as it may desire." The agreement then provides for an immediate dismissal of the injunction suits then pending.

After the dam was built, and in 1933, the Metropolitan Water District commenced construction of a 13-mile tunnel into and through the San Jacinto mountains, which had not been completed at the time this action was tried. In the course of such construction large quantities of water were encountered in the mountains and were released in such a manner that they entered the channel of the river, as it flowed along the base of the mountains, and followed the course of the river into Railroad Canyon where they were intercepted by the defendant's dam and held in its reservoir. The amount of this water thus reaching the reservoir was, up to the time of the trial, in excess of 90,000 acre feet. During that period the defendant was storing behind its dam in Railroad Canyon and diverting down its pipe lines past Lake Elsinore large quantities of this water, and it is admitted that no part of such water was allowed to flow past the dam.

In the meantime, by 1936, the last of a series of dry years, Lake Elsinore had receded until it had a maximum depth of only six feet, an area of less than 1700 acres and a volume of about 5,000 acre feet. The low and stagnant condition of the lake caused the accumulation of a green slime on the surface of the lake along the shore, caused the death of fish therein, and gave rise to noxious odors which pervaded the entire City of Elsinore. The lake became unsuitable for any recreational purpose, which resulted in a decline of property values in the city, a decrease in its population and a loss of business to its inhabitants.

This action was then brought for the purpose of determining whether or not the waters reaching this reservoir as the result of these tunnel operations come within the provisions of the contract referred to, and for the purpose of enforcing

the plaintiff's rights thereunder. The court found in all respects in favor of the plaintiff finding, among other things, that the water intercepted in drilling this tunnel forms a part of the source of supply of the San Jacinto River and except for such interception would form a part of the flow of that river; that the water issuing from said tunnel was not developed and foreign water in respect to the San Jacinto River; that the defendant had for more than two years stored and impounded in its reservoir back of said dam, and diverted therefrom down its pipe line past Lake Elsinore, large quantities of such water in excess of the amounts permitted by the above-mentioned contract; that the defendant threatens to continue the diversion and storage of large quantities of water in excess of the amounts permitted by the contract, which water would otherwise reach Lake Elsinore and raise its level; and that the lowering of the lake level has caused certain described conditions which have injured the City of Elsinore and its inhabitants, for which pecuniary compensation cannot afford adequate relief. As a conclusion of law, the court found that all of the water in question and any other water stored in or diverted from this reservoir is and shall be subject to the terms of the agreement between the parties, including the provision therein that any water diverted, impounded or stored by means of this dam, with the exception of the prescriptive water above referred to, shall be allocated between the parties in accordance with the terms of the contract. Judgment was entered accordingly, it being decreed, in effect, that all of the water in controversy is and shall be subject to the terms of the agreement and that an injunction issue restraining the defendant from diverting into or storing in its reservoir or removing therefrom any such water in excess of the amounts permitted by the contract. From this judgment the defendant has appealed.

The only controversy here is as to whether or not the water thus encountered in the tunnel operations and released into the river was and is subject to the terms of the contract between the parties. The appellant contends that this is foreign water which in the course of nature would never have reached its reservoir or Lake Elsinore, nor have furnished support for other water enabling such other water to reach the lake. In other words, it is contended that it

conclusively appears from the evidence that this water, had it not been artificially turned into the stream bed, would and could have had no material effect upon the flow of water in the San Jacinto River. It is argued that the application of the contract is, by its terms, expressly limited to "water of the San Jacinto river" and that it has no application to waters which in the course of nature would not be a part of the flow of that river but which, because of some external means, happen to be flowing in a part of the bed of that stream. Particular reliance is placed upon paragraph 8 of the agreement, giving the appellant the right to divert and store in its reservoir "from the waters of the San Jacinto River" certain quantities of water varying at respective levels of the lake, and the last sentence of which reads: "The Water Company may also impound and store such waters, in addition to the said waters of the San Jacinto River, and Salt Creek as it may desire." The appellant, claiming that this is water which otherwise would not have reached its reservoir and that the respondent was entitled only to a portion of such flow of the river as would naturally reach Railroad Canyon, relies upon the principle expressed in *Pomona etc. Co. v. San Antonio etc. Co.*, 152 Cal. 618 [93 Pac. 881], that where one is entitled to the use of a given amount of water at a given point he may not lay claim to any excess water reaching that point however it may be produced. This principle has been applied where one party is entitled to a fixed amount, and the other has developed or saved additional water which may be taken without interfering with the right of the first party. Not only was none of the water here in question developed or saved through any efforts of the appellant, but the question remains as to whether the amount to which the respondent was entitled was so fixed by the contract as to exclude it from sharing in these waters.

The appellant contends that the findings, to the effect that the water encountered and intercepted in the construction of this tunnel forms a part of the source of supply of the San Jacinto River, and that without such interception such waters would form a part of the flow or tend to support the natural flow of the San Jacinto River, are not supported by the evidence. It relies upon the testimony of two of its witnesses, one of whom stated that he was a "civil engineer and .

geologist'' and the other that he was a ''consulting engineer and geologist''. It is argued that the testimony of these witnesses stand without contradiction in the record because no other witness who testified qualified himself as a ''geologist''.

These witnesses testified that there are a number of major and minor ''faults'' running near and through the San Jacinto mountains. The principal one is the San Jacinto fault, which runs along the westerly base of these mountains. One of these witnesses testified that he had traced this fault from some miles north of the tunnel to a point near the west portal thereof. The other testified that he believed this fault was buried under an alluvial deposit from that point on southerly. The testimony is that the San Jacinto fault, and a number of lesser faults parallel to it, run in the general direction of northwest to southeast; that there are also a number of minor cross-faults running in a northeasterly and southwesterly direction; and that the effect of the forces of nature was to create a wall or ''gouge'' along the several fault zones, caused by heavy pressure and the intense rubbing of one side against the other which ground the rocks into a fine powder and formed a gouge which was impervious to water. In brief, the theory of these witnesses was that the gouges thus formed along these fault zones acted as dams which would prevent water from passing through them except for trifling leaks in some places. After describing the various faults, so far as known from surface indications and as disclosed by operations in this tunnel, each of these witnesses expressed the opinion that the natural dams created by these fault zones would prevent the waters which were encountered in the drilling of this tunnel from ever reaching the San Jacinto River or from in any way contributing to or affecting the flow of water in that river. One of the main reasons given for this opinion was that the water level in a certain ''graben'' was not lowered by the operations in the tunnel. This graben is an artesian basin lying at the foot of the mountains and through which the San Jacinto River flows during a part of its course. A map in evidence indicates that this graben is a mile or two wide and extends from a point some three miles southerly from the west portal of the

tunnel to a point some 10 miles northerly from the tunnel opening.

It does not seem surprising that the water level in this graben remained the same after the tunnel operations with this extra water flowing through the same, in addition to any other source of supply. Both of these witnesses admitted that there might be fissures in the gouges along the fault zones which would permit some water to escape, although they thought the amounts would be small. One of them testified that no springs along one creek which flows into the San Jacinto River showed any signs of being affected by the tunnel operations, but that some springs along another such creek, located six or seven miles from the tunnel, were dry. This witness further admitted that the tunnel operations had affected the water level or flow of certain springs, water courses and lakes on a large ranch located at the foot of the mountains and near the San Jacinto River causing them to go dry, although others on the same ranch were not affected. This witness testified that there was no way of telling how high these various faults were, how deep they went into the ground, or how far they extended laterally, which he said might be ten feet or ten miles.

A "Civil engineer, in the hydraulic line", with twenty-five years' experience and considerable experience in studying water in connection with the San Jacinto River, testified for the respondent. He testified that in years of normal, or above, rainfall the waters of the San Jacinto River reached Lake Elsinore as surface flow; that of the waterfall in the mountains of the watershed affecting the San Jacinto River a portion flows down immediately, a portion is absorbed in the ground whence it comes out in temporary springs and seepage, and a portion percolates on down and goes into storage in cracks and fissures, escaping at some later time and at some place either in the form of surface springs or underground escape from the mountains; that, in his opinion, the main San Jacinto fault is buried all along the foot of the San Jacinto mountains; that the top of this main fault is below the tunnel in question at its west portal; and that the top of this fault is below the ground surface of the graben to which we have referred. He stated that although these faults do act as dams there is both leakage through fissures in

the faults and overflow over the faults as they are buried, through a modern alluvium of sand and gravel which carries water across the faults. He testified that the buried waters in these mountains reach the graben by passing through the faults and by going over the top of them; that the underground waters in the San Jacinto mountain area northeast of the main San Jacinto fault support the stream flow of the San Jacinto River both by being in contact therewith and by furnishing a reservoir supply of water which escapes as springs and also escapes underground; that these waters both have contact with the water in the graben area and also support that water; that if these mountain waters are reduced in quantity it directly affects the water which will reach and become a part of the flow of the San Jacinto River; and that these mountain waters not only affect the water level in the graben but the water in the graben affects the water in the San Jacinto River by supporting and helping any stream flow that reaches that area. The general effect of his testimony is that the underground storage water in question affected and contributed to the flow of the San Jacinto River both directly, and indirectly by supporting other waters which without such support would not reach and become a part of the flow of that river. His testimony supported the inference that these tunnel operations affected the flow of water in the San Jacinto River by causing a larger present flow at the expense of a later flow.

■ While expert evidence is both valuable and necessary in such a case as this, it by no means follows that the opinion of any one expert witness must be accepted by the court as conclusive. A knowledge of surface indications of possible or probable geological formations may be valuable to an engineer engaged in the study of water conditions and water development. Some knowledge along this line may be acquired by a civil engineer who studies water conditions and the physical facts which affect those conditions over a long period of time, and in a particular area. While the qualifications of these witnesses had an important bearing, as did the reasons they gave for their opinions, both affected the weight that should be given to their testimony by the trial court. Each of these expert witnesses testified at length as to various physical facts in relation to the area above and around the

reaches of the San Jacinto River. It was the duty of the court to consider the respective opinions given by these witnesses, and the reasons therefor, and it cannot be said that the testimony of one of them was entitled to no consideration since that witness had not claimed to be a full-fledged ''geologist'', whatever that may be. A clear conflict appears in the testimony of the expert witnesses.

After considering all of the evidence the court concluded, as stated in a memorandum opinion, ''that the waters from the Aqueduct tunnel do in fact constitute a portion of the waters going to make up the natural flow of the San Jacinto river. That the underground reservoirs constitute a support to the surface flow and do feed the springs and streams tributary to said San Jacinto river and that any asportation of said tunnel waters from the stream or watershed would seriously and injuriously affect the flow of said stream throughout its entire course.'' The question of whether these underground waters, released through the tunnel operations, were waters which would naturally feed this river or furnish support for other waters which would in the course of nature add to the flow of that river, was one of fact. The burden was upon the appellant to prove that these waters, shown to have been flowing in the stream bed and to have been intercepted by the dam in question, were in fact not the waters of the river. (*Larsen* v. *Apollonio,* 5 Cal. (2d) 440 [55 Pac. (2d) 196].) The court found to the contrary and the evidence, although conflicting, is sufficient to sustain those findings.

■ Assuming that the water in question would not, in the course of nature be a part of ''the waters of'' this river, a further consideration is as to the effect of the existing contract upon the rights of the parties thereto, with respect to sharing in the use of said water. This water was not produced by the appellant and, whatever its original source, it was water which did flow down the river and was intercepted by the dam and stored in the reservoir which was created pursuant to the terms of the agreement. That agreement should be given a reasonable construction in order to give effect to the intention of the parties as expressed therein, and should be interpreted in the light of the circumstances under which it was made and the object then sought to be

attained. The primary purposes of the contract were to permit the appellant to erect the dam and maintain the reservoir; to protect the respondent, and the other parties, by limiting the amount which the appellant might divert or impound from the water flowing in that part of the river and which would, except for the dam, proceed on toward Lake Elsinore; and to allocate the water thus diverted or stored as between the respective parties.

While the parties did not then contemplate an artificially accelerated flow of the river at that point the language used indicates an intention to contract, as between themselves, with respect to the storage and disposition of any and all water which would be intercepted by the proposed dam.

The provisions of the contract giving to this appellant a right to divert, impound or store water are contained in paragraphs 4, 5 and 8 thereof. Paragraph 4 gives it the right to divert from the river and store in the reservoir a yearly maximum of 2,000 acre feet of "the first water flowing in Railroad Canyon at or above the dam (exclusive of Salt Creek waters)". This means the first waters flowing in the river which reached Railroad Canyon. That amount is agreed upon as water to which the appellant has a prescriptive right and which it may exclusively use. Paragraph 5 gives the appellant the right to store in the reservoir all or any part of its Perris Valley waters. This is water which the appellant had previously pumped in Perris Valley and brought through Railroad Canyon in a conduit. It is significant that irrespective of the origin of this water or whether or not it would, in the course of nature, have reached this dam, the contract provides that this water when thus stored is "subject to allocation thereof" as provided for in paragraph 6. Paragraph 8 then gives the appellant the right to divert and store in the reservoir from the waters of the San Jacinto River and Salt Creek certain quantities of water at various levels of the lake, with the final provision that it may impound and store such additional waters as it may desire. This last clause is particularly relied upon by the appellant as giving it the right to intercept by its dam, and keep for itself, all of the waters here in question on the ground that they constitute no part of the natural flow of the

river. While that provision permits the appellant to store in the reservoir any foreign water or water which would not naturally flow through Railroad Canyon, it not only refers to water which actually reaches the reservoir but the appellant is not entitled under the terms of the contract to the exclusive use of such water. Paragraph 6 relates to all water that may be impounded by the proposed dam and provides that all waters diverted from the river and/or Salt Creek ''and all other waters impounded and stored in the reservoir'', with the exception of the prescriptive water provided for in paragraph 4, shall be allocated ''one-sixth to first parties and five-sixths to second party''.

It thus clearly appears from the terms thereof that the existing contract between the parties covered the waters here in question and that the court correctly concluded and decreed that all of the water involved in this controversy ''is and shall be subject to the terms of said agreement''.

■ The appellant makes the further contention that, in the exercise of the police power for the promotion of the general welfare, section 3 of article XIV of the state Constitution, adopted on November 6, 1928, limits rights to water to the reasonable use thereof and that the respondent was not entitled to injunctive relief because the contract of October 29, 1927, was against public policy in that it permitted the waste of water. It is argued that the effect of the injunction is to permit the respondent ''to waste water in a stagnant pond'' while depriving the appellant of water it is supplying others for irrigation and domestic purposes. Aside from other considerations, including the fact that water which passes the appellant's dam recharges the cone area from which water is pumped to irrigate lands near the respondent city, the argument that the use of water for the purpose of maintaining the level in Lake Elsinore constitutes waste and unreasonable use thereof is without merit. ■ Neither the maintenance of health-giving recreational opportunities, nor the existence and continuance of large business interests devoted to and built up for the purpose of making those opportunities available to large numbers of its citizens, can be held to be against the public policy of this state.

While the case came up in a different form the principle contended for by this appellant was decided adversely to it in *City of Los Angeles* v. *Aitken,* 10 Cal. App. (2d) 460 [52 Pac. (2d) 585], which case involved Mono Lake, a lake very similar to Lake Elsinore in its conditions and available uses. In that case it was held that the use of stream water to maintain the level of the lake, and the uses and benefits resulting therefrom, were neither unreasonable nor in conflict with the provisions of article XIV, section 3, of the Constitution. In that case, the court said:

"But this limitation of riparian rights of owners of land to a necessary use for beneficial purposes does not mean that the water must be actually used in irrigating the land or consumed for domestic purposes. It does not authorize the appropriation of littoral rights to land bordering on the margin of a lake without the payment of just compensation therefor, when the very value of the land depends on the maintenance of the lake in its natural condition. Irrigation and household uses of water are not the only reasonable or beneficial purposes for which it may be employed, even though the presence of mineral salts or alkali in the water renders it unfit for human consumption or domestic use."

It may be further observed that this issue was not raised by the pleadings or gone into at the trial, and there is no evidence that other sources of supply were not sufficient for the needs of the appellant and the people to whom it supplies water. Under the circumstances here appearing, and as between the parties hereto, this constitutional provision has no application, and no reason appears why injunctive relief was not properly granted.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.