[Civ. No. 24640. Second Dist., Div. Four. Mar. 12, 1962.]

MONTEREY COUNTY FLOOD CONTROL AND WATER
CONSERVATION DISTRICT, Plaintiff and Respondent, v. L. V. HUGHES et al., Defendants and Appellants.

Edmond Gattone and Paul P. Selvin for Defendants and Appellants.

Heller, Ehrman, White & McAuliffe, Albert M. Monaco, Stave & Bryan and Joseph A. Stave for Plaintiff and Respondent.

BALTHIS, J.—This action in eminent domain was brought by plaintiff, Monterey County Flood Control and Water Conservation District, against defendants, L. V. Hughes and Daisy E. Hughes (the singular is hereafter used), to condemn property located in San Luis Obispo County for a dam and reservoir. From the interlocutory and final judgments of condemnation in favor of plaintiff and fixing the monetary damages defendant appeals.

The principal questions presented on the appeal are: (1) Is the taking of property for recreational areas and facilities proper as an incident to an acquisition of land for flood control and water conservation? (2) Was the judgment (for convenience, both judgments are treated as one) one of excess condemnation as to the area of property taken? (3) Was the judgment one of excess condemnation in that the fee simple title as to a portion of the property was taken rather than a flowage easement?

There are additional questions presented as to whether on the trial as to monetary damages the trial court improperly admitted evidence as to other sales, and also as to whether as to one parcel the United States is an indispensable party.

The facts of the case are these: The plaintiff district (consisting of all of the territory within Monterey County) was created in 1947 by the Monterey County Flood Control and Water Conservation District Act (Stats. 1947, ch. 699, p. 1739; West's Water Code App., ch. 52 [Deering's Wat. Code, Act 5064]; sometimes herein called the "act"). By the act, the district is vested with certain enumerated powers (West's Water Code App., § 52-5 [Deering's Wat. Code, Act. 5064, § 5]), including "the right of eminent domain, either within or without said district," and "to take any property necessary to carry out any of the objects or purposes" of the act. (West's Water Code App., § 52-6 [Deering's Wat. Code,

Act 5064, § 6].) Section 4 of the act as originally adopted in 1947 and before the 1956 amendment hereinafter referred to is set forth in the footnote.[1]

It is to be noted that the objects as stated include the control of flood waters and the conservation of such waters for *beneficial* and *useful purposes.*

The board of supervisors of the district adopted a resolution of public necessity as to parcels 1 and 2 belonging to defendant on September 20, 1955, and the action to condemn said parcels for the dam and reservoir project was filed on the same date. Approximately two months later on November 15, 1955, the court made an order for immediate possession. Before defendant appeared the district filed an "amended" complaint on November 16, 1956. In the meantime, on April 25, 1956, section 4 of the act was amended (Stats. 1956 (1st Ex. Sess.), ch. 60, p. 452) to clarify the purposes of the act to include the objective of the construction, maintenance and operation of recreational facilities "as an incident to any works, dam or reservoir heretofore or hereafter constructed."

The "amended" complaint pleaded the district's statutory right to maintain the action and specifically referred to said chapter 60 and also added a third parcel to the other two parcels sought in fee simple.

Defendant did not appear in the action until March 20, 1957, when a demurrer was filed to the "amended" complaint. April 30, 1957, plaintiff filed its "second amended" complaint. This second amended complaint had additional allegations bearing on necessity, and specifically disclaimed any intention of condemning the interests of the United States as the owner of parcel 3. The added allegations as to necessity were (a) that flooding would occur up to an elevation of 825 feet;

---

[1]Section 4 of the Monterey County Flood Control and Water Conservation District Act (Stats. 1947, ch. 699):

"§ 4. The objects and purposes of this act are to provide for the control of the flood and storm waters of the district and the flood and storm waters of streams that have their sources outside the district, but which streams and flood waters flow into the district, and to conserve such waters for beneficial and useful purposes by spreading, storing, retaining, and causing such waters to percolate into the soil within the district, or to save and conserve in any manner all or any of such waters and to protect from such flood or storm waters the public highways, life and property in the district, and the watercourses and watersheds of streams flowing into the district, and to increase, and prevent the waste or diminution of the water supply in the district, and to obtain, retain and reclaim drainage, storm, flood and other waters for beneficial use within the district."

(b) that all lands above, as well as below 825 feet, were necessary for water conservation purposes; (c) that defendant's lands abut upon a minimum pool that would be available for recreational purposes and that plaintiff desired all the lands in fee that adjoined said pool. This second amended complaint again asserted that plaintiff relied on chapter 60. After defendant's demurrer to this second amended complaint was overruled, the defendant answered the second amended complaint.

A pretrial order in the case was made as of November 1, 1957. This order recognized that a motion to amend might be made by plaintiff. The motion for leave to amend was filed by plaintiff on December 5, 1957, and proposed certain amendments which, in effect, repeated the allegations of the prior second amended complaint that public interest, necessity and convenience required the acquisition of parcels 1, 2 and 3 for use in connection with the dam and reservoir, and added the allegation that public interest, necessity and convenience required the acquisition in fee simple of parcels 1 and 2 as an incident to the dam and reservoir for recreational areas and facilities.

After objection to the motion by defendant the court granted plaintiff's motion to amend.

Prior to the trial with a jury on the question of damages, there was a preliminary trial at which the issues of necessity, excess condemnation and all other legal points were tried by the court sitting without a jury.

Defendant's first contention is that the plaintiff district did not have power to condemn property for recreational uses and the court was without jurisdiction to make a judgment condemning property for such purpose.

Defendant argues that on the critical and important date of September 20, 1955, when the action was filed, the district did not have the power to condemn property for recreational uses; that chapter 60 adopted in 1956 and amending section 4 of the act was not retroactive and did not apply to actions pending at the time; that if construed to be retroactive it would be unconstitutional as a violation of the due process and equal protection clauses of the Constitution.

In examining the original act as it existed at the time the action was brought and prior to the amendment of section 4 by chapter 60 the entire statute as a whole and the objectives and purposes sought to be accomplished should be considered.

Section 34 of the act reads:

"This act, and every part thereof, shall be liberally construed to promote the objects thereof, and to carry out its intents and purposes."

The second paragraph of section 6 provides that the power of eminent domain includes the right to take the fee or any lesser estate "in any real property *which the board of supervisors . . . shall determine is necessary* for carrying out the purposes of this act." (Italics added.)

This language plainly vests a wide discretion in the supervisors to determine what property is necessary to be taken for the carrying out of the purposes of the act as a whole.

Section 4 of the act (without considering the amendment made by chapter 60 in 1956) expressly declared that the objects and purposes of the Legislature in adopting the act were to conserve *"waters for beneficial and useful purposes"* and also "to obtain, retain and reclaim . . . waters for beneficial use within the district." (Italics added.)

Section 5 of the act and its several subdivisions contain similar language implying, if not expressly conferring, broad discretion on the supervisors. Subdivision 4 permits acquisition by purchase or condemnation and the sale or disposition of real property, and the construction and operation of any works *"necessary or proper* to carry out any of the objects or purposes of this act and *convenient* to the full exercise of its powers." Subdivision 5 permits storage in reservoirs and conservation of stored water *"for any purpose useful* to the district." Subdivision 6 permits control and conservation of waters *"for beneficial and useful purposes of said district."* Subdivision 9 permits acquisition by purchase or condemnation of property *"necessary or convenient* for . . . lands for reservoirs for storage of necessary water, and all necessary appurtenances." Subdivision 12 permits the district "to do all acts necessary for the full exercise of all powers vested in said district . . . by this act." (Italics added.)

Thus, when the act is read and construed as a whole, it would appear that the act not only confers broad discretion on the district's supervisors with respect to the particular lands or areas deemed necessary, proper or convenient for any project, but it also confers substantial discretion upon them to determine what may be necessary or proper or convenient to carry out any object or purpose of the act, thus

including power to determine whether recreational uses of the stored waters will be beneficial and useful to the district.

The basic policy of the state with respect to the conservation of water is expressed in the Constitution, article XIV, section 3, which provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable. . . ."

Several sections of the Water Code indicate that the *recreational* use of water is a *beneficial* use thereof and is to be considered or planned in flood control and water conservation projects.

Section 12578 provides "that the people of the State have a primary interest in the control and conservation of flood waters . . . and use of the State's water resources *in the general public interest.*" Section 12579 provides in part that "The control, storage and *full beneficial use* of flood waters . . . are proper functions and activities of the State, in cooperation with counties, cities, state agencies and public districts. . . ." Section 12580 provides ". . . that the State should engage in the study and coordination of all water development projects, including flood control projects. . . ." (Italics added.)

Section 12581 provides as follows: "In studying water development projects, full consideration shall be given to all *beneficial* uses of the State's water resources, including irrigation, generation of electric energy, municipal and industrial consumption of water and power, repulsion of salt water, preservation and development of fish and wildlife resources, *and recreational facilities,* but not excluding other beneficial uses of water, in order that recommendations may be made as to the feasibility of such projects and for the method of financing feasible projects." (Italics added.)

Section 12582 reads as follows: "Fish and wildlife values, both economic and *recreational,* shall be given consideration in any flood control or water conservation program." (Italics added.)

In *City of Elsinore* v. *Temescal Water Co.,* 36 Cal.App.2d 116 [97 P.2d 274], the court recognized recreational uses as being consistent with section 3 of article XIV of the state Constitution. In that case an injunction was issued to prevent the diversion of water that was flowing into Lake Elsinore where the primary uses made of the water were for recreation. It also appeared that there were several businesses in the

City of Elsinore which were related materially to the recreational uses of the lake. In affirming the issuance of the injunction, the court said, at page 129: "'. . . the argument that the use of water for the purpose of maintaining the level in Lake Elsinore constitutes waste and unreasonable use thereof is without merit. Neither the maintenance of health-giving recreational opportunities, nor the existence and continuance of large business interests devoted to and built up for the purpose of making those opportunities available to large numbers of its citizens, can be held to be against the public policy of this state."

In view of the fact that recreational uses are clearly related and incidental to the maintenance and operation of a dam and reservoir for flood control and water conservation purposes, and also recognizing the strong public interest in such recreational uses as shown by legislative declarations and approval, we believe that under the act the power of eminent domain would include the taking of property for such related and incidental uses.

The principle of taking incidental property to carry out and make effective the principal uses involved was recognized in *University of Southern California* v. *Robbins*, 1 Cal.App.2d 523, 533 [37 P.2d 163], where the court said: "The same reasoning which allows the taking of sufficient land to permit the erection of a building of suitable dimensions would justify taking such further land as would fully and effectually carry out the purposes for which the building was erected. The taking of the land such as that in question was expressly contemplated by the legislature and is in accord with the liberal construction given by our courts to such provisions of the law."

We conclude that beneficial and useful purposes of flood control and water conservation include recreational uses and that the act (prior to its amendment in 1956) as it stood when the action here was commenced did authorize and empower the plaintiff district to condemn property for such recreational uses, particularly as incidental to a project for flood control and water conservation.

We further believe that chapter 60 (amending § 4 of the act), as adopted in 1956, was applicable to pending condemnation actions and was so intended by the Legislature to be applicable. Chapter 60 was adopted as an emergency measure at the First Extraordinary Session of the Legislature

in 1956 (Stats. 1957 (1st Ex. Sess.), p. 452) and is set forth in the footnote.[2] In the amended section 4 of the act, the Legislature first repeated the exact language previously contained in section 4 of the original act, and it then added a declaration that the objects of the act also were to provide, in the discretion of the district, in connection with and as an incident to any dam or reservoir heretofore or hereafter constructed, for the acquisition and use of lands for recreational areas or facilities. Considering that the project was in process of construction, that condemnation proceedings were known to be pending for the acquisition of various lands for the project and that the pending project should include by way of clarification the acquisition of lands for incidental recreational uses and facilities to be built on unflooded areas, the words "heretofore or hereafter constructed" clearly mean that the objectives were confirmed by the Legislature and should apply to the pending project.

Further, the proviso at the end of the new section 4 specifically and clearly indicates that the amendment should apply to pending actions. In that section the amendment first conferred on the district an unqualified power to take lands for incidental recreational facilities of an upland char-

---

[2] 'Section 1. Section 4 of the Monterey County Flood Control and Water Conservation District Act is amended to read:

"§ 4. The objects and purposes of this act are to provide for the control of the flood and storm waters of the district and the flood and storm waters of streams that have their sources outside the district, but which streams and flood waters flow into the district, and to conserve such waters for beneficial and useful purposes by spreading, storing, retaining, and causing such waters to percolate into the soil within the district, or to save and conserve in any manner all or any of such waters and to protect from such flood or storm waters the public highways, life and property in the district, and the watercourses and watersheds of streams flowing into the district, and to increase, and prevent the waste or diminution of the water supply in the district, and to obtain, retain and reclaim drainage, storm, flood and other waters for beneficial use within the district; and to provide, in the discretion of the district in connection with and as an incident to any works, dam or reservoir heretofore or hereafter constructed either within or without the district, for the construction, maintenance and operation of a minimum or permanent pool and facilities for swimming, boating, fishing and recreation in or upon waters stored in any stream, reservoir, or minimum or permanent pool, and for the acquisition in any manner provided in this act and for the use by the district, in addition or adjacent to lands that may be used or acquired for flood control or water conservation purposes or that may be acquired for the maintenance or protection of any such works, dam or reservoir or watersheds adjacent thereto, of lands deemed by the supervisors of the district to be necessary or convenient for the installation, construction, use and maintenance of recreational areas or facilities including picnic grounds, play grounds,

acter and then, in qualifying language, the Legislature limited the power by requiring the consent of supervisors of counties other than Monterey for the acquisition of lands in such counties for recreational areas or facilities, except with respect to "property sought to be condemned in condemnation proceedings pending before a court upon the effective date of this section (as amended at the 1956 First Extraordinary Session)."

Nothing could more plainly and expressly state that the Legislature, desiring the project to include recreational facilities, approved of the acquisition of all lands in cases then pending and did not require the consent of any other county with respect to the pending project.

 Assuming for the purposes of this discussion that the district did not have power to condemn for recreational uses under the original act at the time the action was filed, the amendment of section 4 of the act and the declaration of the Legislature contained in section 2 of the statute (ch. 60) would seem to be not only clarifying and supplemental but also in a sense curative. Defendant contends that as construed to be retroactive and applicable to pending actions, chapter 60 is unconstitutional as being violative of the due

camp grounds, home sites, boats and fishing, bathing or other facilities for use by the public, subject to such rules and regulations and reasonable charges as may be prescribed by the board of supervisors of the district; provided, however, that no property situated in another county, except property sought to be condemned in condemnation proceedings pending before a court upon the effective date of this section (as amended at the 1956 First Extraordinary Session) shall be condemned by the district for recreational areas or facilities unless the board of supervisors of the county in which such property is situated agrees to the condemnation thereof.

"Sec. 2. This act is hereby declared to be an urgency measure necessary for the immediate preservation of the public peace, health and safety, within the meaning of Section 1 of Article IV of the Constitution and shall therefore go into immediate effect. A statement of the facts constituting such necessity is as follows:

"The act governing this district, as now worded, does not clearly confer upon the district the powers conferred upon it by this act. Public funds have heretofore been voted and provided for the construction of a dam and reservoir by said district, including a reservoir and minimum pool available for fishing and recreational use. The completion of such dam and reservoir pursuant to a contract heretofore let, and the acquisition of property necessary therefor in proceedings now pending is essential to the early elimination of a desperate shortage of water in the County of Monterey. The enlargement of the pending project to include additional areas and facilities for the purposes specified in this act will serve a necessary and desirable public purpose and effect material economies in the cost thereof. To accomplish these purposes it is necessary that this act take effect immediately."

process and equal protection clauses of the Constitution. We do not agree for the following reasons:

(1) Defendant's property was subject to the right of eminent domain by the district and defendant had no vested rights in the preservation of the specific statutes in effect at the time the action was filed.

(2) Defendant's property was not *taken* until after the interlocutory decree was rendered on April 22, 1959, and chapter 60 (adopted April 25, 1956) had then been in effect for approximately three years. This supplemental amendment was in effect long before defendant appeared in the action by demurrer to the amended complaint (March 20, 1957). Any defense predicated upon the argument that at the time action was filed there was an absence of statutory authority to condemn for recreational uses relates solely to a matter which the Legislature might have provided for initially and was validly eliminated by the supplemental statute supplying or ratifying the authority which the Legislature might initially have conferred.

(3) A close examination of the supplemental statute (ch. 60) establishes the fact that the Legislature approved a specific plan for the installation by the district of incidental recreational facilities. When enacting chapter 60 the Legislature must be presumed (a) to have investigated the project as then proposed and as then involved in pending proceedings; (b) to have considered the possibility objection might be made in pending proceedings by various defendants to any incidental recreational uses of the land; (c) to have decided recreational facilities should be installed on the shores of the reservoir within the areas involved in such pending proceedings; (d) to have been satisfied San Luis Obispo County had no objections to such uses of shoreland areas within the scope of the project then under construction and for which lands were being acquired; (e) to have decided it was unnecessary to require the agreement of San Luis Obispo County with respect to the project then contemplated; and (f) to have decided the consent of counties other than Monterey County reasonably ought to be required only in connection with future projects or actual enlargements of the existing project beyond areas involved in such then pending proceedings.

(4) In the case at bar the Legislature has acted specifically with reference to the project in question. The adoption of

chapter 60 in 1956 is in the nature of special legislation approving this improvement and the exercise of eminent domain for flood control, conservation of water *and for incidental recreational uses.*

The recitals of necessity and public interest in the legislation must be given great weight and every presumption should be made in favor of constitutionality.

In *Los Angeles County Flood Control Dist.* v. *Hamilton,* 177 Cal. 119 [169 P. 1028], page 125, the court stated: "Not only must the court view the act in the light of *every presumption and intendment favorable to its constitutionality,* but it must limit itself to a consideration of such facts as appear upon the face of the enactment, together with such others as are matters of judicial cognizance. Neither allegation nor proof of further facts can be considered." (Italics added.)

In *Alameda etc. Water Conservation Dist.* v. *Stanley,* 121 Cal.App.2d 308 [263 P.2d 632], at page 312, it is said: "In considering the subject we must bear in mind that *the Legislature is vested with a very wide discretion in exercising its power to classify* (*Sacramento Mun. Util. Dist.* v. *Pacific Gas & Elec. Co.,* 20 Cal.2d 684 [128 P.2d 529]), and every presumption must be exercised in favor of the validity of the legislative classification (*Dribin* v. *Superior Court,* 37 Cal.2d 345 [231 P.2d 809, 24 A.L.R.2d 864]). Since 1915 when the Los Angeles County Flood Control District was created the Legislature has created 23 flood control and water conservation districts. Of these, 20 are county districts." (Italics added.)

In *Solvang Municipal Imp. Dist.* v. *Jensen,* 111 Cal.App.2d 237 [244 P.2d 492], at page 240 the following appears: "The recitals of [the statute] are determinations of fact as to the conditions which required the organization of an improvement district. *Such recitals, if not contrary to facts that are of common knowledge, will be deemed conclusive by the courts....*

"An urgent need for furnishing necessary facilities in a particular situation has been held to be a sufficient reason for the creation of a district by special law, even though in other respects the facilities could be provided by proceedings under general laws." (Italics added.)

In *City of Los Angeles* v. *Los Angeles County Flood Control Dist.,* 11 Cal.2d 395 [80 P.2d 479], it appeared that a specific amendment to the basic statute authorized the district

to acquire specific properties. The court said at page 403: "This particularity of description of the improvements and property authorized to be accepted by the district *presupposes a prior inquiry and investigation on the part of the legislature* and a finding by it that such designated improvements will be useful for the purposes of the district and beneficial to the territory comprising the flood control district. . . . The Constitution and the decisions do not preclude the carrying out of that program by the enactment of the legislation referred to." (Italics added.)

(5) We believe that the statute here involved (ch. 60) was clearly intended to be retroactive. The mere fact that the legislation is retrospective and that it applies to statutory authorization to condemn does not make it unconstitutional. The curative legislation here in no way affected vested rights in property, or property that had already been taken by condemnation, or defenses in a condemnation action already pleaded; here the legislation was adopted before the defendant had appeared in the action and years before the property was taken by judgment.

In Nichols on Eminent Domain (3d ed.) the following is said in section 4.102 at pages 322-323:

"It follows, therefore, that until the property of an individual is actually taken, the legislature may alter the procedure, change the form of remedy or vacate any finding unjust to the public. *Additional powers may be given to commissioners who are making an acquisition while the proceedings are still pending without violating any constitutional provisions. So, also, an owner has no vested right in a defense to condemnation proceedings based on some technical defect in the taking;* the legislature, by a curative act, can remedy the error and the taking will become valid." (Italics added.)

In conclusion, on defendant's argument that plaintiff had no power (and the court had no jurisdiction) to condemn property for recreational uses, we believe that the findings, conclusions and the judgment of the trial court, asserting that the court had jurisdiction, and the plaintiff district had the authority, to condemn defendant's property for recreational uses, are fully supported by the evidence and are correct in law.

Defendant next contends that if recreational uses are disregarded (because improper and not authorized at the time the action was commenced), there was an excess condemnation

of property both as to area and quantum of estate required for flood control and water conservation purposes.

The findings made at the preliminary trial that are pertinent here are findings 13 and 14 relating to public use and necessity. In finding 13 (set forth in the footnote[3]) the court finds that public interest, necessity and convenience require, first, the acquisition in fee simple of three parcels for the construction, maintenance and operation of the dam and reservoir and, secondly, the acquisition in fee simple of parcels one and two for use, as an incident to the dam and reservoir, for recreational areas and facilities.

In finding 14 (the pertinent portion is set forth in the footnote[4]) the court finds, first, that all three parcels are required for authorized public uses and that a fee simple therein is necessary and convenient for the construction, maintenance and operation of the dam and reservoir and, secondly, that acquisition of parcels one and two in fee simple is necessary and convenient for the construction, maintenance and operation of the dam and reservoir and, as an *incident* thereto, for recreational areas and facilities.

The defendant would eliminate the portions of these findings dealing with recreational uses as improper and not authorized by law and defendant then attacks the remainder of the finding as permitting excess condemnation, first as to *area* and then as to the *estate* taken, a fee simple title.

Defendant argues that the elevation of the dam is 825 feet and that the taking of any land of defendant above 800 feet (possibly 825 feet) constitutes excess condemnation. As defendant points out one of the witnesses for plaintiff testified

---

[3] "13. The public interest, necessity and convenience require the acquisition in fee simple of that certain real property hereinafter described for use in the construction, operation and maintenance of the Nacimiento Flood Control and Water Conservation Dam and Reservoir and the acquisition in fee simple of Parcel One and of Parcel Two hereinafter described for use, as an incident to said dam and reservoir, for recreational areas and facilities, including picnic grounds, play grounds, camp grounds, boats, and fishing, bathing and other facilities for use by the public, to wit: [describing property]."

[4] "The acquisition of said real property in fee simple is necessary and convenient for the construction, operation and maintenance of the Nacimiento Dam and Reservoir project in that the said dam will impound waters to an elevation of 825 feet and inundate substantially all of the land described herein, leaving only a few irregular portions above elevation 825 feet; and in addition to the flooding of the land below 825 feet in elevation, the plaintiff requires the acquisition of that property within Parcels One, Two and Three above 825 feet in elevation for flood control and water conservation purposes."

that from elevation 825 feet (the crest of the dam) to defendant's property line, there are 220 acres in parcel 2 and 15 acres in parcel 1; the conclusion from this is that at least 235 acres of parcels 1 and 2, or approximately 30 per cent of defendant's fee acreage, will never be inundated.

Without reference to incidental recreational uses, the taking of all of defendant's property contained in parcels 1 and 2, and the findings mentioned, are supported by the following:

(1) From the testimony of the district's engineers there is justification and reason for the taking of the maximum areas required for flood control purposes. A summary of some of the testimony of plaintiff's engineers is: Flooding will occur above elevation 800 whenever the water reaches the elevation of the spillway and additional inflow occurs. Water elevations upstream build up above those at the spillway. The maximum elevation of such floods is probably 815 feet. If the spillway design flood should occur, the water would go to elevation 820 and another 5 feet are needed for wave and other action on the reservoir. Water would be impounded above 800 feet, though it might not be at rest, and therefore the dam may impound waters to an elevation of 825 feet, as alleged in the complaint.

Normal procedure is to build the reservoir against such a prospect and to provide some margin. There were several periods in the past when the lake "would have stood" at elevation 800 for three or four months. The elevations reached by floods above 800 feet are not portrayed in the exhibits as they are widely variable, no two floods being alike.

(2) Defendant bases his argument as to excess condemnation upon the computed historical operations of the past and quotes from such records to minimize the frequency, duration and extent of future flooding. However, we believe the trial court was justified in basing its findings upon the estimates and engineering conclusions of plaintiff's witnesses. Naturally, these estimates and recommendations had to be based upon the possible maximum flooding.

(3) As the principal objective of the project is to develop water for conservation and irrigation, the operating policy as to the reservoir was and is maximum storage. This policy to some degree affects the area and estate to be taken.

(4) There was also evidence presented to the court that the area of defendant's land above the elevation of 825 feet was of an irregular shape and was rough, steep brush land

and so "cut-up" that it would have little utility value to the owner.

(5) There was further evidence that any policing and sanitation problems involved in the operation of the dam and reservoir could be more effectively supervised by the plaintiff district by the ownership in fee of the lands above the flooded or inundated areas.

(6) The acquisition of the upper portion of defendant's land was and is also desirable in order to give plaintiff control of the access road to the lake or minimum pool.

(7) Plaintiff's witnesses further testified that the public interest and necessity would best be served by taking all of defendant's lands in fee; that the taking of a flowage easement only as to lands above the minimum pool would present many problems and difficulties as to access, sanitation and control and that any possible savings would be more than offset by the numerous operational problems presented.

(8) The evidence further established that the project, including the adverse effects of constant threat of flooding to the elevation of the design flood, would materially reduce the utility and economic value of the irregular marginal lands belonging to defendant above the elevation of 825 feet; that the fee title to all of defendant's property was required in order for plaintiff to obtain the maximum benefits of the project with the minimum difficulties.

We believe that the evidence summarized above fully supports the findings made by the court and establishes the public interest and necessity for taking all of defendant's property described in plaintiff's second amended complaint in fee, and without regard to the incidental recreational uses involved.

The legal requirements of *necessity* as a condition for the exercise of the power of eminent domain are discussed in the case of *City of Hawthorne* v. *Peebles,* 166 Cal.App.2d 758, 761 [333 P.2d 442]. The court there approved the rule that "necessity" does not mean an absolute but only a reasonable or practical necessity, such as would combine the greatest benefit to the public with the least inconvenience and expense to the condemning party and property owner consistent with such benefit. The court said: "Generally, statutory requirements of necessity as a condition of the exercise of the power of eminent domain are liberally construed by the courts so as not to limit unnecessarily the power of the condemning agency. . . .

 "It is, of course, a question for the trier of fact whether a taking is necessary. [Citations.]

 "And, in considering the question of necessity, the court may consider immediate future needs [citations] . . ., or public economic considerations." (166 Cal.App.2d 758, 761-762 [333 P.2d 442].)

There are several recent cases dealing with the taking of uplands in connection with condemnations for reservoirs or dams. In *United States* ex rel. *T.V.A.* v. *Welch*, 327 U.S. 546 [66 S.Ct. 715, 90 L.Ed. 843], the Supreme Court reversed the district court and the court of appeals, both of which had held that the taking of some 40,000 acres of upland area was not authorized by the statute authorizing the Tennessee Valley Authority to construct a dam and reservoir.

The statute there was similar to section 34 of the act here involved which provides for a liberal construction to carry out its intents and purposes. The court held (1) that the common law rule of construction that required statutory powers of condemnation to be given a restricted interpretation was validly abolished by a provision in the act requiring that it be liberally construed; (2) that the Authority had been given the right to condemn whatever property it deemed necessary to carry out its objectives, even including the power to condemn some 40,000 acres of upland and to transfer them to the park department; (3) that the power of condemnation might be utilized for the purpose of effecting an economic saving in the overall cost of a project and in so doing said:

"Neither the fact that the Authority wanted to prevent a waste of government funds, nor that it intended to cooperate with the National Park Service detracted from its power to condemn granted by the Act. The cost of public projects is a relevant element in all of them and the Government, just as anyone else, is not required to proceed oblivious to elements of cost." (327 U.S. 546, 554.)

In *United States* v. *Willis*, 211 F.2d 1, the Court of Appeals for the Eighth Circuit upheld the condemnation of 80.9 acres which formed "a comparatively narrow peninsula, 1900 feet in length, which extended out into and would be surrounded by the water of the reservoir on three of its four sides." (211 F.2d 1, 3.) The taking had been opposed on the ground that the army engineers had no authority to take the tract in the interest of flood control or navigation, which was the purpose of the project under construction. However, a witness

for the government had testified that the entire area was sought and necessary "for the proper operation and maintenance of the reservoir." (211 F.2d 1, 3.)

In reversing the district court and upholding the power to take the unflooded tract as an incident to the operation and maintenance of the reservoir, the court, as plaintiff's witnesses had done in the instant proceeding, mentioned the public necessity of controlling activities in the upland area in relation to the lake and said:

"The tract could well be, as the Government says, an excellent vantage point for supervision of the reservoir. And, on the other hand, if left in private hands, it could perhaps give rise to difficulties of sedimentation and control of activities, in relation to the lake itself, as well as problems for the school, police, fire and other systems of the State of Arkansas."

The next point made by the defendant relates to the monetary damages awarded at the trial held in March of 1959 by the court sitting with a jury. The argument is made that the court erroneously admitted evidence of other sales remote in time and dissimilar in character. As to time, the court admitted evidence of sales during the period from 1945 to 1957; of eight sales, four were after 1954 and of the remaining four, one was in 1945, two in 1950 and one in 1952. The trial court has wide discretion in determining what evidence is admissible on the question of comparable sales (*Covina Union High School Dist.* v. *Jobe,* 174 Cal.App.2d 340, 350-351 [345 P.2d 78]).

The degree of similarity in character of property, or the matter of proximity in time as to sales, in order to make evidence admissible, cannot be defined by general rule but must rest largely in the sound discretion of the trial court; this is because to a large extent the determinations of such questions will depend on the location and character of the property and the circumstances of the case.

In the instant case it was shown that defendant's lands and all nearby areas were used mainly as grazing or cattle lands; it was also shown that, because of the nature of the terrain and the utility of the lands, frequent sales would be unlikely; and further that the reservoir project was commenced in February 1955 and that sales along the river would never have taken place in the four years immediately preceding the valuation trial in 1959.

We do not think that the court erred or abused its discretion in admitting evidence as to the sales of other parcels, either on the ground of remoteness of time, or on the other ground suggested by defendant that such parcels were not comparable because they did not have reservoir adaptability or riparian characteristics. Further, we do not think the court erred in permitting cross-examination of defendant's witnesses with regard to the purchase price paid by defendant for the land, even though in this case such purchase was made in 1945. The widest latitude is given on cross-examination (*Laguna Salada etc. Dist.* v. *Pacific Dev. Co.*, 119 Cal.App.2d 470, 475 [259 P.2d 498]) ; also, as mentioned above, the character, location and utility value of the property are circumstances to be considered on the question of remoteness of time.

 The last question presented by defendant relates to parcel 3 as to which defendant held only a grazing lease from the United States. Defendant contends that the United States, as the owner of the property, is an indispensable party. In the second amended complaint, plaintiff alleged that it had made application to the United States to acquire its interest in the lands and expressly disclaimed any intention by the action to acquire the title of the United States. It alleged an intention to condemn only the grazing-lease interests of defendant. Such acquisition of the grazing interests of defendant was proper and reasonable for it would avoid subjecting plaintiff to any claims by defendant for damages for trespass to his interests. Under the circumstances and as the interests of the United States will be in no way affected by these proceedings, we believe the condemnation of defendant's severable interests, as grazing lessee, is permissible, and it is not necessary to join the United States as an indispensable party because its interests are unaffected. (See *South* v. *Wishard,* 146 Cal.App.2d 276, 282 [303 P.2d 805].)

For all of the reasons above mentioned, the judgments of the trial court, both interlocutory and final, are affirmed.

Burke, P. J., and Jefferson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 9, 1962.