[Civ. No. 26995. First Dist., Div. Four. Feb. 6, 1970.]

GOLDEN GATE BRIDGE AND HIGHWAY
DISTRICT et al., Petitioners, v.
DALE W. LUEHRING, as General Manager, etc., et al., Respondents;
CITY AND COUNTY OF SAN FRANCISCO et al.,
Real Parties in Interest.

■■■■■■■■■■■■

■■■■■■■■■■■■

---

## COUNSEL

Howard, Prim, Smith, Rice & Downs, Howard N. Nemerovski, Howard M. Downs, Stuart R. Pollak and Jerome B. Falk, Jr., for Petitioners.

Jerome B. White and Albert M. Monaco for Respondents.

Thomas M. O'Connor, City Attorney, Thomas J. Blanchard, Chief Deputy City Attorney, and Robert A. Kenealey, Deputy City Attorney, for Real Parties in Interest.

---

## OPINION

**CHRISTIAN, J.**—The Golden Gate Bridge and Highway District and its directors seek mandate to compel the general manager and auditor of the district to issue warrants for payment of certain surplus revenues of the district to the county governments of the counties comprised within the district. ■■■ We have concluded that the proposed payments, although purportedly authorized by Statute of 1968, chapter 1366, would be contrary to article XIII, section 25, of the California Constitution. Therefore mandate must be denied.

The Golden Gate Bridge and Highway District was created under authority of the Bridge and Highway District Act of 1923. (Stats. 1923, ch. 228, now § 27000 et seq. of the Sts. & Hy. Code.) The district includes all land within the counties of Marin, Sonoma, Del Norte, the City and County of San Francisco, and parts of Napa and Mendocino Counties.

In the fiscal years 1929-1930 and 1930-1931, the district levied taxes (aggregating $467,386.94) on the property owners of the district to meet the preliminary expenses before bonds could be sold. The levies were collected for the district by the county taxing authorities at the same time they collected county taxes (Stats. 1923, ch. 228, § 14).

Over the years which have elapsed since the bridge was opened to traffic,

■■■■■

revenues from bridge tolls have increased spectacularly. All the bonded indebtedness of the district will have been paid in 1971, and the Legislature has directed the district to develop a plan for the future of the bridge. The plan is to consider and report on such alternatives as abolition of the district or, on the other hand, the assumption by it of added transportation responsibilities (Stats. 1969, ch. 805, § 2).

Meanwhile chapter 1366 of the 1968 Statutes became effective. Section 1.5 thereof purports to authorize the district, after making provision for retirement of bonded indebtedness and certain other obligations, to make the payments here in question. This is to be done, according to the statute, in order to "reimburse" all counties within the district for taxes which were collected from the taxpayers of such counties and paid to the district, together with interest at the rate of 4 percent per year, compounded annually, producing totals as follows:

| | |
|---|---:|
| San Francisco | $1,752,678.52 |
| Sonoma | 97,699.32 |
| Marin | 60,695.08 |
| Napa | 45,275.88 |
| Del Norte | 22,549.23 |
| Mendocino | 15,951.36 |

It is established without dispute that the district has reserves adequate to meet its obligations. Respondents, who are the general manager and the auditor of the district, resist the directors' order to pay the counties as provided in the statute only on the theory that the statute proposes a gift of public funds in violation of article XIII, section 25, of the California Constitution, which provides, in pertinent part: "nor shall [the Legislature] have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever; . . ."[1]

It should first be noted that the constitutional inhibition applies to gifts to a county, although it is not a municipal corporation or, strictly speaking, a corporation of any kind. The prohibition is broad and general; there is no apparent reason why the Constitution should exempt only counties from the general prohibition, which apparently applies to all other governmental entities, including the state itself. (*County of Los Angeles* v. *Riley* (1936) 6 Cal.2d 625, 627 [59 P.2d 139, 106 A.L.R. 903].)

Petitioners contend first that a transfer of public funds will not constitute a "gift" under article XIII, section 25, if it will be used by the

---

[1]This provision, adopted in 1966, restates the provisions of former article IV, section 31, without substantial change.

transferee entity for "public" as opposed to "private" purposes. Operation of county governments is clearly a public purpose. Moreover, a statute making (or authorizing) an appropriation, even though containing no specific limitation that the money is to be used for proper public purposes, may be read in the light of constitutional limitations. The statute cannot be held unconstitutional on the basis of a mere assumption that the counties would use the funds for improper purposes. (*County of Los Angeles* v. *Riley, supra,* 6 Cal.2d 625, 627; see *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 211 [282 P.2d 481].)

But respondents point out that in order to escape the prohibition of article XIII, section 25, an appropriation must not only be used by the recipient entity for a *public* purpose, but must be used in furtherance of the *particular* public purpose of the transferring governmental entity. In the present case, a showing is needed that the counties would use the funds for purposes for which the district itself could have used them. The Supreme Court has stated the rule as follows: "[A] contribution from one public agency to another for a purely local purpose of the donee agency is in violation of the constitutional prohibition, but . . . such a contribution is legal if it serves the public purpose of the donor agency even though it is beneficial to local purposes of the donee agency." (*Santa Barbara etc. Agency* v. *All Persons* (1957) 47 Cal.2d 699, 707 [306 P.2d 875], revd. on other grounds, 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174], mod. 53 Cal.2d 743 [3 Cal.Rptr. 348, 350 P.2d 100].)

In *Mallon* v. *City of Long Beach, supra,* 44 Cal.2d 199, the Supreme Court noted that state gifts, in trust, of tide and submerged land to municipal corporations do not violate the constitutional prohibition because of the interest of the entire state in the development of its harbors. It then stated with regard to the case before it: "If defendants' interpretation of the statute is the correct one, the city now has available for general municipal expenditures millions of dollars that were not available to it before the enactment of the 1951 statute. [Citation.] There being no benefit to all the people of the state from such a transfer, it would be a gift of public monies and thus prohibited by the Constitution." (*Id.* at p. 210.) Acknowledging that the monies would be spent by the city for a public purpose, the court continued: ". . . we cannot hold that the construction and establishment by the city of Long Beach of storm drains, a city incinerator, a public library, public hospitals, public parks, a fire alarm system, off-street parking facilities, city streets and highways, and other expenditures that have been authorized to be made from the 'Public Improvement Fund,' are of such general state-wide interest that state funds could properly be expended thereon. Such expenditures are for purely 'municipal affairs' within the meaning of section 6 of article XI of the Constitution. [Citations.] More-

over, they are normal expenditures for a municipal corporation to make, and to hold that a grant of public monies from the state to defray such expenditures is not a gift within the meaning of section 31 of article IV of the Constitution would render meaningless the express prohibition therein against gifts to 'municipal corporations.' " (*Id.* at pp. 211-212.)

Comparable reasoning was used in *City of Oakland* v. *Garrison* (1924) 194 Cal. 298, 304 [228 P. 433], where the court noted that gifts to a municipal corporation were prohibited by the Constitution and concluded: "It is not sufficient, therefore, that the appropriation here in question be for a public purpose. It must also be for a purpose which is of interest and benefit generally to the people of the [transferor entity]." (Also see 46 Ops.Cal.Atty.Gen. 138, 140 [Nov. 16, 1965].)

Thus, the decisions speak both of furthering the purpose of the donor entity, and of the general interest of the people within that entity. But the two formulations may be reconciled by observing that the cases talking in terms of the general interests of the people of the donor entity have involved gifts by the state or a county (*Mallon* v. *City of Long Beach, supra,* 44 Cal.2d 199; *City of Oakland* v. *Garrison, supra,* 194 Cal. 298; 51 Ops.Cal.Atty.Gen. 71). Such entities have extremely broad "purposes," affecting in many ways the welfare of their citizens; they are therefore empowered to undertake many kinds of activity in furtherance of the general welfare of their citizens. The authorities that have said the expenditures must further the purpose of the donor have involved proposed transfers by limited purpose agencies (a water agency in *Santa Barbara etc. Agency* v. *All Persons, supra,* 47 Cal.2d 699, reversed on other grounds 357 U.S. 275, mod. 53 Cal.2d 743, and a sanitary district in 46 Ops.Cal.Atty.Gen. 138). Such agencies do not have the broad responsibilities of the state and counties. Therefore, it appears that an agency's public "purpose" and its "interests" are but different expressions of the same concept. Indeed, an entity with a narrow and particular purpose, such as a water or sanitary or highway district, could hardly have an "interest" apart from furtherance of the purpose for which it was established. Therefore, in the present case, we must determine what the purpose of the Golden Gate Bridge and Highway District is. It may then be seen what its "interests" are.

The act pursuant to which the district was formed specified the general purposes of the enactment as provision for the acquisition and construction of highways, bridges and approaches thereto (Stats. 1923, ch. 228, p. 452). More specifically, it has been held that the purpose of the Golden Gate Bridge and Highway District is " 'the bridging of the Golden Gate . . .'" (*Doyle* v. *Jordan* (1926) 200 Cal. 170, 189 [252 P. 577]; also see 28 Ops.Cal.Atty.Gen. 12, 13).

It has persuasively been argued that the activities of the district need not be confined to the particular project for which the district was organized (28 Ops.Cal.Atty.Gen. 12, 15). But any expanded activities must be in furtherance of the general purpose for which the district was formed. Petitioners refer to the broad "interests" of the district; but as a limited purpose agency, the district can have no interest other than furtherance in some way of the purpose for which it was created. Therefore we must determine whether the counties will use the money to be received from the district to further the district's purpose of bridging the Golden Gate. Petitioners do not contend that the funds will be used for projects directly—or even indirectly—related to facilitating public transportation across (that is, of bridging) the Golden Gate. Nor do petitioners argue that the district itself could spend money in the manner in which the counties may spend the donated funds, i.e., for the general operation of the county governments, including such functions as law enforcement, welfare, and libraries. Petitioners argue, nevertheless, that the expenditures of the funds by the counties—apparently in any manner they choose—will promote the "interests" of the district.

Petitioners contend that the district will be benefited by transportation planning and recreational projects of the counties, for which part of the appropriated money will "doubtless" be spent. But there is no assurance that any, let alone all, of the money would be spent for such projects. The Legislature placed no limits on the use of the money; neither did the board's resolution ordering disbursement impose any limits on use of the funds by the counties.

At the request of petitioners, we have taken notice of Resolution No. 6938 of the district directors, adopted after oral argument in this proceeding. According to that resolution, the monies to be "refunded" to the counties shall be "impressed with the limitation, that said monies shall be expended by the counties only for such purposes as will be of benefit to the Golden Gate Bridge, Highway and Transportation District. By way of illustration but not of limitation, such projects might include traffic studies, street improvements and maintenance, or other expenditures affecting traffic to and from the bridge. . . ." The resolution contains a "finding" that the district will be benefited by the proposed payments "by assisting the counties within the District in meeting their fiscal responsibilities . . ." and "will contribute to the overall economic and political health of the area in which the District is situated and which it serves, thereby enabling the counties to deal more effectively with the various problems which they face (including transportation matters) and attracting additional population to the area within the District. . . ." This language appears to be mere camouflage. The purported limitations to district purposes are not

supported by the statute, and are too vague to be reliable indications of what the counties would do with the money.

It is also suggested that the district's interests would be promoted by the counties' expenditure of funds to drum up increased use of the bridge— either because funds will be used to build recreational facilities or because, by helping the counties meet their financial obligations, the expenditures will contribute to the overall economic and social health of the area, thereby attracting additional population. This argument is untenable; the purpose of the district is "bridging . . . the Golden Gate," that is, providing access between Marin and San Francisco Counties for those who wish to cross, and not drumming up as many persons as possible to make the crossing. The only apparent way in which additional users could promote the interests of the district would be by furnishing additional revenue, necessary for adequate maintenance of, or addition to, the facilities provided for bridging the Golden Gate. But there is no showing that the district is languishing because of inadequate traffic on the bridge. Indeed the very basis of the petition is the assumption, to the contrary, that the district has revenues in excess of its actual needs.

There is thus no showing that the transfer of these monies to the counties would promote the interests of the district in any substantial way. Indeed, it was apparently not intended, by the Legislature or by the board, that these transfers would benefit the district. The enabling legislation stated that: "[I]nasmuch as . . . each of said counties urgently need[s] all available revenue to assist in financing the operation of . . . each of said county governments for the 1968-69 fiscal year, it is essential that this act go into immediate effect so that the money repaid may be available at the commencement of the 1968-1969 fiscal year." (Stats. 1968, ch. 1366, § 6.) Petitioners themselves repeat the same refrain: "In this important case, a governmental body, established for a special, limited purpose, finds itself with substantial uncommitted funds. At the same time, the counties which formed it and whose taxpayers initially financed it have pressing needs for additional funds for a host of public purposes.

". . . Local governments everywhere are straining to meet their expanding public obligations, with increasingly burdensome yet rising property tax rates." We conclude that, although the counties could doubtless make good use of more money, the district's purposes would not be advanced by the proposed transfers.

Petitioners argue that the transfers are nonetheless permissible as a "refund" of monies contributed by county taxpayers in 1929-1931 for the financing of the district's preliminary expenses. This is, in fact, the theory on which the transfers were authorized by the Legislature, and ordered by

the board of directors. Petitioners contend that a refund is not considered an unconstitutional gift so long as the purposes for which the funds were originally expended by the donor entity were proper expenditures.

The soundness of the general proposition asserted by petitioners may be doubted. *Sinton* v. *Ashbury* (1871) 41 Cal. 525, relied upon by petitioners, was decided before the predecessor provision of article XIII, section 25, was added to the Constitution. In *Reclamation Board* v. *Riley* (1930) 208 Cal. 661 [284 P. 668], appeal dismd. 283 U.S. 798 [75 L.Ed. 1421, 51 S.Ct. 490], *Sacramento etc. Drainage Dist.* v. *Riley* (1926) 199 Cal. 668 [251 P. 207], and *Reclamation Board* v. *Chambers* (1920) 46 Cal.App. 476 [189 P. 479], the assumption of part of the bonded indebtedness of the "donee" entity was upheld upon a showing that the assumption served an important interest of the state as the donor entity, quite apart from the purpose for which the expenditure was originally made. We have seen that no such showing is made here. It is true that there is dictum in *County of Los Angeles* v. *Rockhold* (1935) 3 Cal.2d 192, 199 [44 P.2d 340, 100 A.L.R. 149], indicating that where the original expenditure would have been a lawful expenditure of the donor entity a later gratuitous assumption of the obligation by the donor entity was permissible. But that dictum was questioned by the Supreme Court in a later decision *(County of San Diego* v. *Hammond* (1936) 6 Cal.2d 709, 721 [59 P.2d 478, 105 A.L.R. 1155]) and there are other cases holding that gratuitous assumption of an obligation or reimbursement of an expenditure is not generally permissible even though the original obligation or expenditure might have been in furtherance of purposes of the donor entity (see *Conlin* v. *Board of Supervisors* (1896) 114 Cal. 404 [46 P. 279, 33 L.R.A. 752]; *Molineux* v. *State of California* (1895) 109 Cal. 378 [42 P. 34, 50 Am. St.Rep. 49]; *Conlin* v. *Board of Supervisors* (1893) 99 Cal. 17 [33 P. 753, 37 Am.St.Rep. 17, 21 L.R.A. 474]; *McBean* v. *San Bernardino* (1892) 96 Cal. 183 [31 P. 49]).

There is a further weakness in petitioners' contention that the proposed transfers are proper as reimbursements or refunds of expenditures which the district would have been authorized to make directly. No *reimbursement,* or *refund,* is proposed. The payments would go not to district taxpayers but to county governments, which never contributed anything to the district. Indeed *county* taxpayers did not make the original contributions —the taxes paid were levied by the district and paid by taxpayers in their capacity as *district* taxpayers. The county tax authorities collected the taxes, but the county governments had nothing to do with their imposition and never had any right to the amounts collected. Once the district was formed, persons owning taxable property within the district became taxpayers of the district as well as of the county and became subject to taxes levied by

the district's board of directors for district purposes. Levies by the district board were independent of any authorization by the county governments. (See Stats. 1923, ch. 228, § 10, subd. 9, § 14.) In short, the money which the district now seeks to "refund" was always its own money. It is therefore incorrect to speak of a "refund" of this money to the counties. In reality the proposed payments would be subventions to the general funds of the counties, paid out of bridge tolls collected from the traveling public by this special purpose district.

Petitioners argue that article XIII, section 25, of the Constitution was not intended to apply where there is "identity" between the class of taxpayers which initially contributed the funds to be returned and the class of persons indirectly benefiting from the "refund" of such funds. It is contended that *Garrison, supra,* and *Mallon, supra,* show that the only concern behind the constitutional prohibition is that one group of citizens not be taxed for the benefit of another group. But the argument overlooks the fact that the money raised by district taxation was spent long ago. It is proposed, 40 years later, to "reimburse" the county governments, and thus indirectly benefit present-day property taxpayers, at the expense of user tolls. It is not contended that there is substantial identity between property taxpayers as a class and bridge users as a class. Moreover the argument, even if valid, does not avoid the apparent concern behind the constitutional prohibition that money not be taken from people ostensibly for one purpose (here, bridging the Golden Gate) and then be used for another purpose (operation of county governments).

A broader question is whether the constitutional prohibition was ever intended to apply to the type of transfer involved here. As respondents have stated the issue, "[it] is whether the State Constitution permits the enactment of statutes that will authorize the transfer of funds of financially successful, limited-purpose public agencies to counties for the general and unrestricted governmental purposes of such counties, . . ." Real party in interest, City and County of San Francisco, suggests that payment of surplus revenues to the counties actually is a purpose of the district, pointing out the fact that the 1923 statute, under which the district was formed, provided that surplus district revenues should be distributed to the counties within the district. (Stats. 1923, ch. 228, §§ 10, 21.) Those provisions were codified in 1943 as Streets and Highways Code sections 27165[2] and 27306, which made

---

[2]Section 27165. "The district may acquire by purchase, gift or condemnation, or lease from the United States, this State, or from any person, or public or private corporation, lands, rights of way, or rights in, over or across lands or waters which are necessary or proper for the construction or operation of bridges and the approaches thereto, fix and collect tolls, for the purpose of meeting the obligations of the district and repaying the same, *and dispose of the surplus to the various counties within the district.*" (Italics added.)

provision for distribution to the counties of any annual surplus. The latter section was repealed (Stats. 1951, ch. 1332, § 4, p. 3221) but the more general provision of Streets and Highways Code section 27165 remains in effect.

■ There is no reason to doubt the constitutional validity of Streets and Highways Code section 27165 as a means of breaking an impasse regarding the disposition of funds remaining to a district when it had been dissolved or its functions completed. But there is nothing in the statutes to indicate an intention to enable counties to use bridge and highway districts as moneymaking enterprises. But section 27154, subdivision (b), authorizes the use of surplus funds to retire bonded indebtedness, therefore the further provision in section 27165, allowing disposition of surplus to the counties, appears to have been intended to specify a means of disposition of surplus on dissolution. In any event these provisions do not suggest an intention to make the giving of subventions to the general funds of the counties a purpose of the Golden Gate Bridge and Highway District.

■ Petitioners make a further argument related to that of the city. They contend that the constitutional prohibition has no "meaningful application" to the district and its "constituent counties" because they are so "uniquely intertwined." The directors of the district are appointed by the counties' boards of supervisors. But the counties are not "constituents" of the district. Rather the district is a special-purpose entity controlled by representatives of the counties. A very important point at which the district and the counties are not "uniquely intertwined" is that of revenue. It is true that taxpayers within the counties contributed the cost of forming and launching the district and that their property may be subject to taxation to pay off the bonded indebtedness. But, as we have seen, they did this in their capacity as district taxpayers (into which capacity they voted themselves). The revenues of the district, in contrast, are derived from tolls—paid by a group of people who are not claimed to be substantially identical with county or district taxpayers. Therefore, there is no "intertwining" of the district and the counties so far as revenue is concerned.

Any justification for exemption from the constitutional prohibition depends on the purpose which article XIII, section 25, was intended to serve. Petitioners have asserted that the only concern behind the constitutional prohibition on gifts was that public funds not be taken from one group of taxpayers and applied for the exclusive benefit of another group of taxpayers. The provision suggests a further purpose: to prevent diversion to an extraneous purpose of public moneys raised for a limited purpose. In any event petitioners propose to take money from one group of citizens—the tollpayers—and apply it to the benefit of another group—the county taxpayers. Bridge users might well object to this idea, on the ground that

the district should continue to be serviceable to its original purpose of "bridging . . . the Golden Gate" and for that purpose should apply its revenues to the improvement of transportation across the Golden Gate.

Of course, the Constitution does not inhibit an entity of local government from collecting fees for services it performs and using the net proceeds of enterprises such as municipal utility systems for the benefit of its own general fund. (See Cal. Const., art. XI, § 19.) There is no reason why the same thing cannot be done by several local jurisdictions in a joint exercise of their powers. (Cf., Gov. Code, § 6512.1.) But the Golden Gate Bridge and Highway District is not a joint powers enterprise. It was formed pursuant to the statute by vote of the people residing within its boundaries and has earned revenues in the performance of its own special purpose of "bridging the Golden Gate." ■■■ To permit diversion of a portion of those revenues into the general funds of the counties would be contrary to the apparent purposes of article XIII, section 25, of the Constitution.

■■■ Finally, the city advances a contention that the inclusion in the 1923 statute of the provisions we have reviewed for disposition of surplus funds implies "a compact in the nature of a contractual relationship between the six counties, the Bridge District and the State." But it has already been held that the terms upon which the district was formed under the statute do not constitute a contract (*Wheatley* v. *Superior Court* (1929) 207 Cal. 722, 726 [279 P. 989]). Moreover, the claimed contract could not overcome the constitutional inhibition.

The alternative writ is discharged and the petition is denied.

Devine, P. J., and Rattigan, J., concurred.