[No. D036822. Fourth Dist., Div. One. Apr. 4, 2001.]

STEVEN WHITE, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

## COUNSEL

Richard I. Fine & Associates and Richard I. Fine for Plaintiff and Appellant.

Hennigan, Mercer & Bennett, Bruce Bennett, Laura Lindgren, Lawrence C. Jones and Gregory K. Jones for Defendants and Respondents County of Orange, Orange County Development Agency, Donald J. Saltarelli, James W. Silva, Roger R. Stanton and William G. Steiner.

Woodruff, Spradlin & Smart, Kennard R. Smart, Jr., Daniel K. Spradlin and M. Lois Bobak for Defendant and Respondent Orange County Transportation Authority.

Bill Lockyer, Attorney General, Linda A. Cabatic, Assistant Attorney General, Marsha A. Bedwell and Keith Yamanaka, Deputy Attorneys General, for Defendant and Respondent State of California.

## OPINION

**HALLER, J.**—In 1994, Orange County filed for bankruptcy. To resolve this financial crisis and assist Orange County to emerge from bankruptcy, the California Legislature passed four bills allocating certain property and sales tax revenues to Orange County's general fund that were previously allocated to other Orange County public agencies.

Steven White, an Orange County taxpayer, brought this action seeking declaratory relief that the statutes enacted through these bills are unconstitutional and/or violate applicable statutes. The trial court entered a judgment of dismissal after defendants successfully demurred to the complaint. White appeals. We affirm.

FACTS

In December 1994, Orange County filed for bankruptcy. In June 1995, Orange County voters rejected a ½ cent sales tax to be used to help the county emerge from bankruptcy. In October 1995, the Legislature passed four bills in an attempt to resolve Orange County's financial problems (Recovery laws). In passing each of these bills, the Legislature made the following findings and statements of purpose:

"(a)  The County of Orange government lacks sufficient resources to finance an acceptable plan of adjustment in its pending bankruptcy case.

"(b)  On June 27, 1995, the voters of the county defeated a proposed sales tax increase, indicating the public's unwillingness to raise new revenue to finance a plan of adjustment.

"(c)  It is in the interest of the state and all public debt issuers within the state to enable the county to finance an acceptable plan of adjustment in order to improve the credit standing of California public debt issuers and to preserve and protect the health, safety, and welfare of the residents of the county and the state. To that end, successfully resolving the county bankruptcy and restoring the financial position of Orange County government and thereby permitting the full performance under the county's indebtedness is a matter of statewide interest and concern.

"(d)  In the absence of some alternative source of revenue not now available to the county, resources from other governmental units within the county must be transferred to the county to enable it to prepare, and obtain confirmation of, an acceptable plan of adjustment.

"(e)  The transfer of resources to the county should be designed to minimize the impact on affected entities.

"(f)  The emergence from bankruptcy of the county through the confirmation of an adequate plan of adjustment will assist in the effectuation of the primary purposes of the Community Redevelopment Law . . . , including job creation, attracting new private commercial investments, the physical and social improvement of residential neighborhoods, and the provision and maintenance of low- and moderate-income housing. . . ." (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 2; Assem. Bill No. 1664 (1995-1996 Reg. Sess.) § 2; Sen. Bill No. 1276 (1995-1996 Reg. Sess.) § 2.)

To achieve these goals, the Legislature passed the four bills—Senate Bill No. 863, Assembly Bill No. 1664, Senate Bill No. 1276, and Assembly Bill

No. 200—adding to and amending various codes, including the Government Code, Health and Safety Code, Revenue and Taxation Code, and Streets and Highways Code. We briefly describe the primary subject matter of each of these bills below, and will later discuss the bills in more detail when relevant to a particular legal issue raised on appeal.

*Senate Bill No. 863* modified the annual allocation of Orange County property tax revenues by reducing the property tax allocation to two Orange County districts (a flood control district and a harbors, beaches and park fund (parks fund)) and requiring that $4 million that would have previously been placed annually in each of these funds be deposited in the county's general fund for 18 years. (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 5.) Senate Bill No. 863 also required Orange County's redevelopment agency to transfer $4 million per year to the general fund for 20 years; the Legislature stated these payments constituted repayment for the redevelopment agency's debt for "general and specific benefits . . . previously provided by the county." (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 2.)

*Assembly Bill No. 1664* concerns law that permits a county board of supervisors to contract with the State Board of Equalization to establish a local transportation fund in the county treasury, and then provides a formula for depositing sales and use taxes into this fund. (Assem. Bill No. 1664 (1995-1996 Reg. Sess.) subd. (1); see Gov. Code, § 29530.) This bill authorized Orange County's Board of Supervisors to modify its contract with the State Board of Equalization to require, with respect to sales taxes levied during a 15-year period, that annual revenues of approximately $38 million be deposited in the Orange County general fund instead of into the county's local transportation fund (OCTA). (Assem. Bill No. 1664 (1995-1996 Reg. Sess.) § 10; see Gov. Code, § 29530.5.)

*Senate Bill No. 1276* concerns California law providing for a "Highway Users Tax Account" into which the state deposits state gas tax funds to be used for road work, mass transit and related purposes. (Sts. & Hy. Code, § 2100 et seq.) The State Controller apportions funds from state gas tax funds to localities according to statutory directives. (Sts. & Hy. Code, § 2103.) Senate Bill No. 1276 directs the controller to allocate $1.9 million per month to the OCTA from the Highway Users Tax Account; these funds would have previously been allocated to the county. (Sen. Bill No. 1276 (1995-1996 Reg. Sess.) § 4.) Senate Bill No. 1276 also concerns the appointment of a trustee pending bankruptcy recovery. (Sen. Bill No. 1276 (1995-1996 Reg. Sess.) § 3.)

*Assembly Bill No. 200* is primarily nonsubstantive and corrects technical problems in the other three bills. It was enacted to: (1) make changes to

provisions added by Assembly Bill No. 1664 with regard to sales taxes; (2) revise certain language in Senate Bill No. 1276 regarding the trustee appointment; and (3) change the operative dates contained in Senate Bill No. 1276. (Assem. Bill No. 200 (1995-1996 Reg. Sess.).)

The Governor signed the Recovery laws on October 9, 1995. In May 1996, the bankruptcy court confirmed the county's plan of adjustment to emerge from bankruptcy. Under the plan, the county would issue bonds to be funded using county revenues allocated to the county general fund by the Recovery laws.

Seven months later, in December 1996, White filed his complaint requesting the court to declare the Recovery laws invalid. White named various public officials and public entities as defendants.[1] The trial court sustained defendants' demurrer to the complaint. White appeals.

### DISCUSSION

#### I. *Standard of Review*

■ In evaluating a judgment sustaining a demurrer, we review the complaint de novo to determine whether it states a cause of action. (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501 [82 Cal.Rptr.2d 368].) We assume the truth of all facts properly pled and the truth of facts that may be implied or inferred from these allegations. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459 [80 Cal.Rptr.2d 329].) In addition, we read the pleadings as if they contained all matters of which we may take judicial notice, including the statutory law of this state. (*El Rancho Unified School Dist. v. National Education Assn.* (1983) 33 Cal.3d 946, 950, fn. 6 [192 Cal.Rptr. 123, 663 P.2d 893]; see Evid. Code, § 451, subd. (a).) "The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. . . . [Citations.]' " (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We must reverse if "the plaintiff has stated a cause of action under any possible legal theory. [Citation.]" (*Id.* at p. 967.)

#### II. *California Constitution, Article IV, Section 16*[2]

■ As the primary focus of his appellate briefs, White contends the Recovery laws violate article IV, section 16 because they apply only to

---

[1]Those defendants included the State of California, the County of Orange, the State Controller (Kathleen Connell), the members of the Orange County Board of Supervisors (Roger R. Stanton, William G. Steiner, James W. Silva, and Donald J. Saltarelli), the OCTA, and the Orange County Development Agency.

[2]All further references to an article are to the articles of the California Constitution.

Orange County, and therefore are improper "special legislation." Article IV, section 16 states: "(a) All laws of a general nature have uniform operation. [¶] (b) *A local or special statute* is invalid in any case if a general statute can be made applicable." (Italics added.)

■ It is well settled that article IV, section 16 does not prohibit the Legislature from enacting statutes that are applicable solely to a particular county or local entity. (See *People v. Mullender* (1901) 132 Cal. 217, 221 [64 P. 299]; *Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 177 [36 Cal.Rptr.2d 886].) By its express terms, article IV, section 16 prohibits this type of legislation only if "a general statute can be made applicable." (See *People v. Mullender, supra,* 132 Cal. at p. 221.) In determining whether "a general statute can be made applicable," the issue is not whether the Legislature could conceivably enact a similar statute affecting every locality. (*Id.* at p. 222.) Rather, it is whether "there is a rational relationship between the purpose of the enactment . . . and the singling out of [a single] . . . county affected by the statute." (*City of Los Angeles v. City of Artesia* (1977) 73 Cal.App.3d 450, 455 [140 Cal.Rptr. 684]; see *People v. Mullender, supra,* 132 Cal. at pp. 221-222; *Alameda etc. Water Dist. v. Stanley* (1953) 121 Cal.App.2d 308, 314-316 [263 P.2d 632].) The Legislature's determination that this rational relationship exists is entitled to great weight and will not be reversed unless the determination is arbitrary and without any conceivable factual or legal basis. (See *City of Los Angeles v. City of Artesia, supra,* 73 Cal.App.3d at p. 456; *Monterey County Flood Control & Water Conservation Dist. v. Hughes* (1962) 201 Cal.App.2d 197, 209 [20 Cal.Rptr. 252]; *Alameda etc. Water Dist. v. Stanley, supra,* 121 Cal.App.2d at p. 314.)

■ Here, with respect to each bill, the Legislature specifically found "a general statute, within the meaning of section 16 of article IV of the California Constitution, cannot be made applicable due to the uniquely severe fiscal crisis being experienced by affected local agencies, and that, therefore, this special statute is necessary." (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 9; see Assem. Bill No. 1664 (1995-1996 Reg. Sess.) § 14; see also Sen. Bill No. 1276 (1995-1996 Reg. Sess.) § 5.) The Legislature further found that it is in the interest of the entire state to resolve the Orange County financial crisis and to assist Orange County in resolving its bankruptcy filing, and that without the reallocation of resources Orange County would not obtain confirmation of a bankruptcy recovery plan. (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 2; Assem. Bill No. 1664 (1995-1996 Reg. Sess.) § 2; Sen. Bill No. 1276 (1995-1996 Reg. Sess.) § 2.)

These findings are legitimate and reasonable determinations. Given the unique nature of the Orange County financial situation—which involved a

public entity bankruptcy and voters who were unwilling to raise taxes to fund a bankruptcy recovery—the Legislature acted within its authority to determine that narrowly targeted legislation was necessary to protect the fiscal health of the county and the entire state, and that generally applicable laws would not be appropriate to meet the situation. Because no other county had declared bankruptcy, the Legislature could have reasonably determined that the Recovery laws suitable for Orange County would not be suitable for the other counties.

In challenging these principles, White relies primarily on *Westbrook v. Mihaly* (1970) 2 Cal.3d 765 [87 Cal.Rptr. 839, 471 P.2d 487]. In *Westbrook*, the California Supreme Court held the California Constitution's requirement of a two-thirds approval for bond measures was unconstitutional because it violated federal equal protection rights. (*Id.* at p. 799.) In reaching this conclusion, the court discussed California history in the late 1800's, and, in so doing, briefly characterized the predecessor to article IV, section 16 as an "absolute ban on special legislation." (2 Cal.3d at p. 776.) The United States Supreme Court thereafter granted certiorari in *Westbrook*, and then vacated the *Westbrook* decision after it decided *Gordon v. Lance* (1971) 403 U.S. 1 [91 S.Ct. 1889, 29 L.Ed.2d 273], which held a supermajority vote requirement for the adoption of a tax does not violate federal equal protection rights. (See *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 254 [45 Cal.Rptr.2d 207, 902 P.2d 225].)

Because *Westbrook* was vacated by the United States Supreme Court, it has no binding or persuasive value. (See *Bennett v. West Texas State University* (5th Cir. 1986) 799 F.2d 155, 159, fn. 3.) But even if the decision is entitled to some precedential value on subjects other than the equal protection issue,[3] the *Westbrook* court's brief reference to the predecessor to article IV, section 16 as an "absolute ban on special legislation" is dicta and entitled to little or no weight. Before *Westbrook*, the California Supreme Court had long held the constitutional provision permits special legislation if general legislation cannot be made applicable. (See *People v. Mullender, supra,* 132 Cal. at pp. 221-222.) Without analysis of the issue or citation to supporting authority, *Westbrook*'s characterization of the provision as an "absolute ban" cannot reasonably be interpreted as an implied overruling of these prior holdings. (See *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1300-1301 [77 Cal.Rptr.2d 296].) Moreover, because the

---

[3]Following the United States Supreme Court's vacating *Westbrook*, California courts have continued to cite *Westbrook* on matters other than the specific equal protection issue resolved in *Gordon*. (See, e.g., *People v. Olivas* (1976) 17 Cal.3d 236, 243-244 [131 Cal.Rptr. 55, 551 P.2d 375]; *In re Marriage of Alarcon* (1983) 149 Cal.App.3d 544, 555 [196 Cal.Rptr. 887]; *People v. Hicks* (1983) 147 Cal.App.3d 424, 427 [195 Cal.Rptr. 127].)

constitutional provision does not on its face constitute an "absolute ban" on special legislation, there is no principled basis for resorting to legislative history to read this ban into the provision. (See *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1046-1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].) We note that after *Westbrook*, California Courts of Appeal have continued to apply prior law and hold that special legislation is appropriate where a general law would not achieve legislative goals. (See *South Santa Clara Valley Water Conservation Dist. v. Santa Clara Valley Water Dist.* (1978) 76 Cal.App.3d 852, 857 [143 Cal.Rptr. 193]; *City of Los Angeles v. City of Artesia, supra,* 73 Cal.App.3d at p. 455; *McGlothlen v. Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1024-1027 [140 Cal.Rptr. 168].)

White's reliance on *Hollman v. Warren* (1948) 32 Cal.2d 351 [196 P.2d 562] and *Stout v. Democratic County Central Com.* (1952) 40 Cal.2d 91 [251 P.2d 321] is also misplaced. In each of those cases, the court found no "conceivably rational basis" for the special legislation applicable to only one county. (*Hollman, supra,* 32 Cal.2d at p. 359; *Stout, supra,* 40 Cal.2d at p. 95.) Here, the Legislature identified a reasonable and rational basis for the need to enact legislation directed only to Orange County. Further, in light of the reasonable distinction between Orange County and the other counties of the state, the fact that White can hypothesize an alternative method for resolving the crisis does not show the statutory scheme is unconstitutional. The Legislature has the authority to determine the best method for resolving state fiscal issues, and it is not for the court to second-guess its determination.

The trial court properly sustained defendants' demurrer to White's causes of action based on article IV, section 16.

### III.   *Government Code Section 53724, Subdivision (e)*

■   White also alleges the Recovery laws violate Government Code section 53724, subdivision (e), which states "[t]he revenues from any *special tax* shall be used only for the purpose or service for which it was imposed, and for no other purpose whatsoever." (Italics added.) The trial court found there was no violation because the identified taxes were general, rather than special, taxes. We agree. Because none of the challenged revenues arose from taxes that were imposed for a particular purpose, Government Code section 53724, subdivision (e) did not preclude the Legislature from reallocating these revenues.

### A.   *Definitions of Special Tax*

The California Supreme Court first construed the phrase "special taxes" in the context of Proposition 13 to mean "taxes which are levied for a specific

purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes." (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 57 [184 Cal.Rptr. 713, 648 P.2d 935].) Thereafter, the voters adopted Proposition 62, which added the code section at issue here, Government Code section 53724, subdivision (e), prohibiting special tax funds to be used for purposes other than the purposes for which the tax was imposed. Proposition 62 also added Government Code section 53721, which essentially adopted the *Farrell* definition of a "special tax," stating, "General taxes are taxes imposed for general governmental purposes. Special taxes are taxes imposed for specific purposes."

Four years later, the California Supreme Court clarified the distinction between the two types of taxes in the context of statutory special purpose agencies (special districts). (*Rider v. County of San Diego* (1991) 1 Cal.4th 1, 13-15 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (*Rider*); see *Coleman v. County of Santa Clara* (1998) 64 Cal.App.4th 662, 669 [75 Cal.Rptr.2d 516].) The *Rider* court explained that when a special district imposes a tax, *Farrell*'s definition of a general tax as a "levy placed in the general fund" is potentially misleading because localities could avoid rules relating to special taxes by creating a special purpose agency and placing the tax revenues in the agency's *general fund*. (*Rider, supra,* 1 Cal.4th at p. 14.) To prevent this loophole, the court stated that the *Farrell* rationale does "not extend to limited purpose agencies." (*Ibid.*) The court instead held that a "special tax" in the context of a special district is "one levied to fund a specific governmental project or program, such as the construction and financing of the County's justice facilities. . . . [U]nder the foregoing principles, *every* tax levied by a 'special purpose' district or agency would be deemed a 'special tax.'" (*Id.* at p. 15, original italics.)

## B.   *White's Allegations*

White alleges the Recovery laws violate Government Code section 53724, subdivision (e) because the legislation allocated tax revenue to the county general fund that had previously been allocated to the (1) OCTA (local transportation fund); (2) flood control district and parks fund; and (3) county redevelopment agency. To state a cause of action under this theory, White was required to allege the challenged tax revenues arose from a "special tax." (See Gov. Code, § 53724, subd. (e).) Although White did assert this allegation, the statutory and decisional law of this state conclusively establishes this allegation is without merit. The challenged tax revenues were raised as general taxes that could be used for any legitimate governmental purpose.

### 1. *Sales Taxes Allocated to the OCTA*

A county's authority to impose sales taxes is derived from a state law known as the Bradley-Burns Uniform Local Sales and Use Tax Law (Bradley-Burns law). (Rev. & Tax. Code, § 7201.) Under the Bradley-Burns law, a county may impose sales taxes, but is required to contract with the State Board of Equalization for the performance of all administrative functions, including tax collection. (Rev. & Tax. Code, § 7202, subd. (d); see *Santa Clara County Local Transportation Authority v. Guardino, supra,* 11 Cal.4th at p. 249.) Once the State Board of Equalization collects county sales taxes, the board has the obligation to transmit those revenues back to the counties pursuant to contract or state law. (Rev. & Tax. Code, § 7204.)

Before the Recovery laws were enacted, Orange County had a contract with the State Board of Equalization providing that a certain percentage of Bradley-Burns law sales tax funds be deposited into its local OCTA fund. The statutory authority for this contract derived from Government Code section 29530, which states "[i]f the board of supervisors so agrees by contract with the State Board of Equalization, the board of supervisors shall establish a local transportation fund in the county treasury and shall deposit in the fund [a specified amount of sales tax] revenues transmitted to the county by the State Board of Equalization . . . ." The Recovery laws added Government Code section 29530.5, which permitted the Orange County Board of Supervisors to modify this contract to instead provide that these sales tax funds be deposited into Orange County's general fund.[4] (See Assem. Bill No. 1664 (1995-1996 Reg. Sess.) § 10.)

This description makes clear that the money that would have previously been allocated to the OCTA and now will be deposited in Orange County's general fund did not come from a "special tax." The Bradley-Burns sales tax is the origin of the reallocated revenue and that tax is a general tax. It is imposed by a general governmental entity (the county) and the revenue is available for general governmental purposes. (See *City and County of San Francisco v. Farrell, supra,* 32 Cal.3d at p. 57.) The fact that the county may contract with the State Board of Equalization to allocate a portion of the amount collected into a certain fund does not convert the sales tax into a "special tax." The determination by a governmental entity as to where to spend general sales taxes is not equivalent to saying that the tax was "levied" for that particular purpose.

---

[4]Government Code section 29530.5 states that the Orange County Board of Supervisors "may, upon the adoption of a resolution . . . , unilaterally modify its contract . . . with the State Board of Equalization, to require that, effective on or after July 1, 1996 . . . county sales and use tax revenues specified in Section 29530 be deposited into the county general fund . . . ."

To support his position, White relies primarily on *Rider*'s definition of a special tax, i.e., "one levied to fund a specific governmental project or program." (*Rider, supra,* 1 Cal.4th at p. 15.) *Rider* held that an entity may not avoid special tax restrictions merely by creating a "special district" agency and placing funds into the "general fund" of that agency. (*Id.* at pp. 13-15.) It did not state or suggest that a contract between a county and the State Board of Equalization allocating general sales tax funds to a local agency can thereafter convert general tax funds into special tax monies, which thereafter cannot be reallocated to the county general fund. Unlike in *Rider* where the sales tax was "impos[ed] . . . for the purpose of financing the construction of justice facilities" (*id.* at p. 5), the sales tax here was not levied for a specific purpose.

### 2.   *Property Taxes Allocated to Flood Control District and Parks Fund*

White's contention with respect to the tax revenues reallocated from the flood control district and parks fund is similarly flawed. The money initially placed into these funds was not raised for a specific purpose; rather the revenues were derived from property taxes, which are general taxes, and merely allocated to these funds by the county.

The California Constitution gives the state the power to allocate property tax revenue among the counties and other local agencies and entities. (Art. XIII A, § 1; Rev. & Tax. Code, § 93, subd. (b); see *Ventura Group Ventures, Inc. v. Ventura Port Dist.* (2001) 24 Cal.4th 1089, 1099 [104 Cal.Rptr.2d 53, 16 P.3d 717]; *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1457 [29 Cal.Rptr.2d 103]; *City of Rancho Cucamonga v. Mackzum* (1991) 228 Cal.App.3d 929, 941 [46 Cal.Rptr.2d 448].) Revenue and Taxation Code section 96.1 provides for the manner in which property tax revenues shall be apportioned to each jurisdiction. Under this code section, each jurisdiction is generally "allocated an amount of property tax revenue equal to the amount of property tax revenue allocated . . . in the prior fiscal year . . . ." (Rev. & Tax. Code, § 96.1, subd. (a).)

To change these allocated amounts with respect to Orange County, the Legislature added Revenue and Taxation Code section 96.16, providing: (1) for the 1996-1997 fiscal year the amount of Orange County property tax revenue "deemed allocated" to the flood control district and parks fund shall be reduced by $4 million each, and the amount "deemed allocated" to the general fund shall be increased by that same amount; and (2) "for each of the next [19 years] . . . the auditor shall allocate property tax revenues in those amounts that fully reflect the modifications required by the preceding sentence." (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 5.)

This change in property tax allocation from the flood control district and parks fund to the general fund did not involve special taxes. The property taxes reallocated were general taxes because they were not levied for a specific purpose. (See *City of Camarillo v. County of Ventura* (1994) 26 Cal.App.4th 1351, 1355 [31 Cal.Rptr.2d 920]; *Solvang Mun. Improvement Dist. v. Board of Supervisors* (1980) 112 Cal.App.3d 545, 552 [169 Cal.Rptr. 391]; *Loyola Marymount University v. Los Angeles Unified School Dist.* (1996) 45 Cal.App.4th 1256, 1267 [53 Cal.Rptr.2d 424].) Moreover, unlike in *Rider*, they were not raised by a special purpose agency to be used for a particular purpose. The fact that the taxes had been previously allocated to parks and flood control districts does not convert the general property tax into a special tax.

Although White's complaint also alleged redevelopment agency funds were special taxes and thus could not be transferred for other uses, he does not assert error with respect to this allegation in his appellate briefs. He thus has waived this argument on appeal. In any event, we reach the same conclusions with respect to these funds. The redevelopment agency revenues at issue were raised by general taxes (property taxes) rather than special taxes.[5]

The trial court properly sustained defendant's demurrer to White's causes of action based on Government Code section 53724, subdivision (e).

### IV. *Article XVI, Section 6*

White next alleges the Recovery laws violate article XVI, section 6 because the laws transfer local agency funds to Orange County's general fund without furthering the interests of the "donor" agencies.[6]

Gifts of public money violate article XVI, section 6. (*Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 207 [56 Cal.Rptr.2d 732].) But "[m]oney spent for public purposes is not a gift . . . ." (*Ibid.*) "The determination of what constitutes a public purpose is primarily a matter for the Legislature, and its discretion will not be disturbed by the courts so long as that determination has a reasonable basis." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 746 [97 Cal.Rptr. 385, 488 P.2d

---

[5]We note further that White has never alleged nor argued that the reallocations required by Senate Bill No. 1276 (money reallocated from the Highway Users Tax Account to the OCTA) constitute improper reallocations of a special tax, or in any other way violate an applicable statutory or constitutional provision.

[6]Article XVI, section 6 states in relevant part: "The Legislature shall have no power to . . . make any gift or authorize the making of any gift, or any public money or thing of value to any individual, municipal or other corporation whatever . . . ."

953].) Here, the Legislature made specific findings that the funds transferred were necessary to enable Orange County to recover from its financial crisis and "to improve the credit standing of California public debt issuers and to preserve and protect the health, safety, and welfare of the residents of the county and the state." (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 2; Assem. Bill No. 1664 (1995-1996 Reg. Sess.) § 2; Sen. Bill No. 1276 (1995-1996 Reg. Sess.) § 2.) These constitute valid public purposes for the legislation.

White nonetheless argues the Recovery laws mandate fund transfers between county agencies and these transfers violate the state Constitution because they do not promote the specific interests of the "donor agencies," i.e., the flood control district, the parks fund, the OCTA, and the redevelopment agency. White relies on *Golden Gate Bridge etc. Dist. v. Luehring* (1970) 4 Cal.App.3d 204 [84 Cal.Rptr. 291], which held article XVI, section 6 prohibited a state agency that raised funds from one group of taxpayers (through imposing user fees) from transferring those funds to another public entity for the benefit of another group of taxpayers, unless the funds are used "in furtherance of the *particular* public purpose of the transferring governmental entity." (4 Cal.App.3d at p. 208, original italics; see *Edgemont Community Service Dist. v. City of Moreno Valley* (1995) 36 Cal.App.4th 1157, 1163-1166 [42 Cal.Rptr.2d 823]; *Atlantic Richfield Co. v. County of Los Angeles* (1982) 129 Cal.App.3d 287, 299 [180 Cal.Rptr. 901].) The *Golden Gate Bridge* court reasoned that the fund transfer was improper because it offended an important goal of article XVI, section 6: "prevent[ing] diversion to an extraneous purpose of public moneys *raised for a limited purpose*." (*Golden Gate Bridge etc. Dist. v. Luehring, supra,* 4 Cal.App.3d at p. 214, italics added.)

This holding and reasoning of *Golden Gate Bridge* are inapplicable here.

First, as detailed above, most of the Recovery laws do not involve transfers of funds from one agency to the other, but instead concern the Legislature's reallocation of funds from Orange County local agencies to the county's general fund. Article XVI, section 6 is not triggered merely because the Legislature has allocated less property tax dollars to certain local agencies and instead determined that such funds should be allocated to the general fund to be used for a public purpose.

Second, even assuming the reallocations could be viewed as transfers between agencies, the challenged transfers concern the reallocation of sales and property taxes. The same general group of taxpayers who paid these taxes will benefit from the transfer. A showing of specific public benefit to the transferor agency is only necessary where there is not a substantial

identity between the taxpayers who paid the taxes and those who will benefit. (See *Atlantic. Richfield Co. v. County of Los Angeles, supra,* 129 Cal.App.3d at p. 299; see also *Golden Gate Bridge etc. Dist. v. Luehring, supra,* 4 Cal.App.3d at p. 213.) Moreover, unlike in *Golden Gate Bridge,* the funds challenged here were not specially raised for the purposes of the "transferring" agencies; rather, as explained earlier, they were levied as property taxes and then allocated to these funds and agencies.

Further, to the extent there is any merit in White's argument that there occurred a prohibited transfer of funds from Orange County's redevelopment agency to the county general fund, this transfer did not constitute an unconstitutional "gift" because the Legislature found this transfer was payment for a debt and that this payment would ultimately promote the purposes of the redevelopment agency. Specifically, the Legislature found the termination of bankruptcy (through the reallocation of funds) would "assist in the effectuation of the primary purposes of the Community Redevelopment Law . . . , including job creation, attracting new private commercial investments, the physical and social improvement of residential neighborhoods, and the provision and maintenance of low- and moderate-income housing." (Sen. Bill No. 863 (1995-1996 Reg. Sess.) § 2.) Because there is a reasonable basis for such conclusion, the legislative finding is binding on this court. (See *County of Alameda v. Carleson, supra,* 5 Cal.3d at p. 746.)

The trial court properly sustained defendants' demurrer to White's cause of action based on article XVI, section 6.

### V. *Article IV, Section 9*

White next alleges the Recovery laws violate article IV, section 9, which provides "[a] section of a statute may not be amended unless the section is re-enacted as amended."[7] (See *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 989 [9 Cal.Rptr.2d 102, 831 P.2d 327].)

■ Under article IV, section 9, when the Legislature votes on a bill that will amend a particular code section and then the Governor signs the bill, the entire section must be restated for the amendment to be effective. The purpose of this rule "is to avoid the 'confusion which almost always results

---

[7]Article IV, section 9 states: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void. A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted as amended."

when amendments are attempted by way of directing the insertion, omission or substitution of certain words, or by adding a provision, without setting out the entire context of the section [of the statute] to be amended . . . .' [Citation.]" (*Yoshisato v. Superior Court, supra,* 2 Cal.4th at pp. 989-990; accord, *Hellman v. Shoulters* (1896) 114 Cal. 136, 152 [45 P. 1057]; *American Lung Assn. v. Wilson* (1996) 51 Cal.App.4th 743, 748 [59 Cal.Rptr.2d 428].)

In this case, the Legislature reenacted each statute that was amended, i.e., the entire code section was restated when a particular code section was changed by striking out or inserting words. White does not contend these amendments violated article IV, section 9.

White instead argues the Legislature violated article IV, section 9 when it added a new code section (rather than amending an existing one) and failed to "reenact" other code sections that would be affected by the change. The argument is without merit.

The courts have long held that the constitutional "reenactment rule does not apply to the addition of new code sections or the enactment of entirely independent acts that impliedly affect other code sections." (*American Lung Assn. v. Wilson, supra,* 51 Cal.App.4th at p. 749; see *Hellman v. Shoulters, supra,* 114 Cal. at p. 150; *Harris v. Fitting* (1937) 9 Cal.2d 117, 120 [69 P.2d 833]; *Southern Pac. Co. v. Railroad Com.* (1939) 13 Cal.2d 89, 124-125 [87 P.2d 1055]; *Huening v. Eu* (1991) 231 Cal.App.3d 766, 772 [282 Cal.Rptr. 664].) Interpreting a predecessor provision, the *Hellman* court explained that although the addition of a statutory provision "in a sense" may "amend" another statute, to require the reenactment of every such statute "would introduce into the law an element of uncertainty which no one can estimate. It is impossible for the wisest legislator to know in advance how every statute proposed would affect the operation of existing laws." (*Hellman v. Shoulters, supra,* 114 Cal. at p. 152.) The constitutional provision analyzed in *Hellman* was replaced by the current provision, which even more clearly "limits the reenactment requirement to amendments of specific sections of a statute."[8] (*Huening v. Eu, supra,* 231 Cal.App.3d at p. 773, fn. 3.)

Although not cited by either party, we are aware that one Court of Appeal has recognized an exception to the long-standing rule that reenactment is

---

[8]The former provision, article IV, section 24, declared that "No law shall be revised or amended by reference to its title; but in such case the Act revised or section amended shall be reenacted and published at length as revised or amended." The current provision expressly refers only to a "*section* of a statute" as the subject that may not be amended without a reenactment. (Art. IV, § 9, italics added.)

unnecessary when the Legislature enacts a separate statute. (*American Lung Assn. v. Wilson, supra,* 51 Cal.App.4th at pp. 749-751.) *American Lung Association* held a reenactment may be necessary when the Legislature adds a new statute *if* the new code section directly amends another existing statute, *and* the legislators and the public would not be reasonably notified of the direct change in the law unless the existing statute is reenacted. (*Ibid.*) In this case, we have examined each new code section added by the Recovery laws and conclude there is no possibility of confusion. Even without a reenactment, the legislators and the public have been reasonably notified of the changes in the law.

Based on the plain language of the constitutional provision, the Legislature did not violate article IV, section 9 when it added new code sections without restating each of the statutes that would be changed by the enactment. Thus, the court did not err in sustaining defendants' demurrer to White's causes of action based on article IV, section 9.

### VI. *"Special Fund" Daugherty Claim*

White next alleges the Recovery laws were unlawful under *Daugherty v. Riley* (1934) 1 Cal.2d 298 [34 P.2d 1005] (*Daugherty*).

*Daugherty* concerned the propriety of transferring funds from the state division of corporations to the state general fund. (*Daugherty, supra,* 1 Cal.2d at pp. 307-308.) The court held these transfers were prohibited because the corporations division was funded solely through permit and license fees and the law expressly requires the fees to be "permanently set apart . . . for the use of the department." (*Id.* at p. 308.) Viewing these applicable statutes as requiring these revenues to be held in the nature of a trust fund, the court explained that "the legislature may not on the one hand set up a department to . . . regulate . . . business transactions . . . imposing fees upon those affected for the purpose of carrying out the purposes of the law, and on the other hand permanently divert the funds thus raised and constituting the life blood of the department to a general fund or other general tax purpose." (*Id.* at p. 309.) But the court stressed that this "*same rule does not of course apply to funds raised under the power of taxation.*" (*Ibid.,* italics added.) Our Supreme Court has since narrowly construed *Daugherty,* declining to preclude transfers between an agency and a general fund, where the agency fund is not "in the nature of trust funds in the sense in which that term was used in the *Daugherty* case." (See *Urban v. Riley* (1942) 21 Cal.2d 232, 236 [131 P.2d 4].)

Here, the funds at issue were raised under the taxation power, and not as user fees to be maintained in a separate account for a particular agency. None of the challenged funds were raised exclusively by an agency solely for the furtherance of the agency purposes. Instead, the affected funds derive from property taxes and/or sales taxes that have then been allocated to each of the agencies. Thus, *Daugherty* is inapplicable.

## VII.   *Article XIII C, Section 2(c)—Proposition 218*

Article XIII C, section 2, states, "Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition . . . ." White argues the Recovery laws require voter approval because they "diver[t]" and "exten[d]" general taxes for "other purposes."

Article XIII C, section 2, does not require a vote before the Legislature may "divert" a general tax. Moreover, the Legislature here did not extend a tax within the meaning of the constitutional provision. Read in context, the prohibition against extending taxes without a vote means a prohibition against extending the imposition of a tax for a continued time period. This did not occur here. The Recovery laws did not impose, extend or increase taxes of any kind. The fact the Recovery laws provide for the reallocation of certain preexisting general tax revenue does not mean the tax is "imposed" or "extended" for purposes of this constitutional provision. *Santa Clara County Local Transportation Authority v. Guardino, supra,* 11 Cal.4th 220, relied upon by White, contains no support for White's position.

## VIII.   *Laches*

In their answer, defendants asserted a laches defense. We need not reach this issue because we have determined White failed to state a cause of action in his complaint. We note, however, there appears to be substantial merit to the defense. White did not file his complaint until 14 months after the Recovery laws were enacted and seven months after the bankruptcy plan was approved. The delay appears on its face to be unreasonable, particularly in light of the substantial potential prejudice to the defendants and the general public.

## DISPOSITION

Judgment affirmed.

Kremer, P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 27, 2001.